UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan ALCANTAR, also known as Canelo,
Defendant–Appellant.

No. 94–2867.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1995.

Decided May 7, 1996.

Barry Rand Elden, Chief of Appeals, Patrick Layng (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Samuel J. Cahnman (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, RIPPLE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Juan Alcantar was convicted by a jury of conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846, and of attempting to possess cocaine with the intent to distribute in violation of 21 U.S.C. § 846. The district court sentenced Alcantar to a prison term of 188 months. In this appeal, Alcantar argues that the evidence at trial was insufficient to support his conspiracy conviction because the government's case depended upon the inherently incredible testimony of a confidential informant. Alcantar therefore requests that we reverse that conviction and remand for resentencing on the surviving conviction for attempted possession. Yet we find the evidence sufficient to establish Alcantar's participation in a narcotics distribution conspiracy and therefore affirm.

## I.

The government's case at trial relied heavily on the testimony of Mario Lopez, who in the midst of the events at issue here, agreed to cooperate with the government by acting as a confidential informant. In October 1992, Lopez was sharing a Chicago apartment located at 2654 South Drake Street with Jose "Tito" Santamaria when Tito's cousin Esteban Zapata moved in. Zapata was a drug dealer, and he soon recruited Lopez to work on his behalf. Zapata would obtain cocaine from two sources—his cousin Marco Zapata in Dallas, Texas, and Marco Rodriguez in Mexico. These suppliers would ship cocaine to a source in Elgin, Illinois, where it would be picked up and brought to Chicago by one of Zapata's subordinates. The cocaine would then be distributed through Zapata's extensive distribution network. Alcantar and his co-defendant Ismael Cano were alleged to be two of Zapata's Chicago distributors.

Lopez testified that he picked up his first shipment of cocaine for Zapata in Elgin in late December 1992. That was a fifty kilogram shipment, and Zapata stored the cocaine in a garage owned by Tito's brother. Zapata initially had difficulty getting rid of this cocaine at the price he was seeking because cocaine prices in Chicago were somewhat depressed at the time. Chicago prices soon rose, however, and Zapata was then able to distribute the entire shipment.

With this change in fortunes, Zapata began receiving cocaine shipments approximately once every two weeks. Zapata used Lopez to pick up the shipments in Elgin, usually from a man Lopez knew only as Cuco. Lopez would travel to a designated parking lot off Route 31, park next to Cuco, pop open his trunk, and wait as Cuco placed a bag of cocaine inside. Lopez generally would not pay for the cocaine upon receipt, but only after the shipment had been distributed. At that point, Lopez would travel back to Elgin, pay Cuco, and learn when the next cocaine shipment would arrive.

After receiving a shipment, Lopez would take the cocaine to his girlfriend's residence on South Hoyne Street, inspect it, and then call Zapata. He would learn from Zapata how much cocaine should be delivered to each of Zapata's eight or nine distributors. Tito and Lopez would then make the deliveries.

Zapata initially told Lopez that Cano's cocaine should be delivered to Alcantar, who is Cano's brother-in-law. Lopez (and sometimes Tito) would drive to an alley behind South Kolin Street where Alcantar would meet them. There, they would transfer a beer case packed with cocaine to Alcantar through an open window. Alcantar did not pay for the cocaine at this time. Instead, several days later, Cano would deliver a portion of the amount owed Zapata to the South Drake Street apartment, while Alcantar would deliver the remainder to Lopez in the South Kolin Street alley. On occasion, Cano would instruct Zapata to deliver a portion of his cocaine to a man named "Jessie," and Lopez and Tito would then deliver half of Cano's cocaine to Alcantar and half to Jessie.

Zapata's cocaine operation functioned smoothly between January and March 1993, with Zapata receiving and successfully distributing approximately ten shipments. In

late March, however, a dispute developed between Zapata and his suppliers that interrupted the regular shipments of cocaine. Zapata's suppliers maintained that approximately $300,000 was owed to them and that the money was needed to pay their source in Mexico. Zapata insisted that he had paid the missing money to Cuco, but the suppliers refused to send additional shipments until the dispute was resolved.

On April 22, 1993, a court-authorized wiretap was placed on the telephone at the South Drake Street apartment. Between April 22 and July 12, 1993, federal agents monitored approximately 2,800 calls, including many relating to the missing $300,000 and to Zapata's efforts to obtain further cocaine shipments. On April 24, for example, Alcantar attempted to reach Zapata at the South Drake Street apartment but spoke instead to Rolando Lopez. Alcantar asked Rolando if there was going to be any more work, but Rolando said he did not yet know.

The dispute between Zapata and his suppliers was never adequately resolved, and Zapata was therefore unable to obtain further cocaine shipments from his cousin or Rodriguez. On July 12, 1993, Zapata, Tito, and Rolando Lopez were murdered in the South Drake Street apartment. By that time, Mario Lopez had moved out of the apartment and was living with his girlfriend on South Hoyne Street. Lopez had visited the South Drake Street apartment on the afternoon of July 12, but he had left at approximately 7:00 p.m. Lopez learned of the murders when Chicago police officers came to his girlfriend's apartment later that evening. Over the next several days, local police and federal drug enforcement agents questioned Lopez about his murdered friends. Lopez said nothing about the money dispute until the agents confronted him with their knowledge of Zapata's drug trafficking operations. Lopez then filled in many of the details about Zapata's operations and also described the dispute over the missing $300,000. Lopez eventually agreed to cooperate with the government and to contact certain of Zapata's former distributors.

On September 22, 1993, Lopez met Alcantar at a local tavern. Lopez was wearing a wire, and a transcript of their conversation was provided to the jury at Alcantar's trial. Lopez told Alcantar that he was back in the drug business, and he asked whether Alcantar would be interested in working with him. Alcantar said he would have to check with Cano, who at the time was vacationing in Mexico. In the course of their conversation, Lopez and Alcantar reminisced about the cocaine Alcantar and Cano had moved for Zapata in the past. Alcantar estimated that he and Cano had distributed between ten and fifteen kilograms of cocaine a week.

After this meeting, there was a series of recorded conversations between Lopez and Cano relating to Lopez' plan to begin distributing cocaine himself and eventually to a planned delivery to Cano and Alcantar. In the early conversations, Lopez told Cano that he needed a trustworthy individual like Alcantar to work as his driver, as Lopez had done for Zapata. Cano indicated that he could not spare Alcantar, however, as Alcantar was vital to Cano's own operation. Lopez and Cano also reminisced about their work with Zapata, with Cano revealing the extent of his own involvement as well as that of Alcantar. Indeed, Cano told Lopez that he had once loaned Alcantar to Zapata when Zapata had been in need of an individual to drive cocaine to Chicago from Miami. Eventually, however, the conversations focused on a proposal by Lopez to deliver cocaine to Cano and Alcantar for distribution. Lopez and Cano agreed that on November 17, 1993, Lopez would deliver approximately ten kilograms of cocaine to an apartment located at 3114 Millard, where Alcantar would be waiting. Lopez indicated that he would be driving a van, and he confirmed for Cano that Alcantar would recognize the van.

Lopez arrived at the alley behind 3114 Millard at approximately 1:20 p.m. on November 17, and Alcantar was waiting for him there. Alcantar got into the van, and Lopez quickly gave him a bag of sham cocaine. Lopez instructed Alcantar to tell Cano and Jessie that there were "ten" in the bag. Lopez then told Alcantar that he needed the bag back once they had the money. Alcantar agreed, then left the van and began walking with the bag toward the building at 3114

Millard. Law enforcement agents moved in and arrested him. Alcantar was subsequently charged with attempting to possess cocaine on November 17, 1993 with the intent to distribute it, and with conspiring to possess and to distribute cocaine between December 1992 and November 17, 1993.

## II.

Alcantar does not challenge his conviction for attempted possession of cocaine on November 17, 1993, presumably because he had with him at the time of his arrest a bag that he believed to contain ten kilograms of cocaine. The jury's verdict on that charge was amply supported by Lopez' testimony, the tape-recorded conversations between Lopez and Cano leading up to the November 17 delivery, the testimony of agents who conducted surveillance during that delivery, and the recording of Alcantar's conversation with Lopez as the bag changed hands inside the van. Conceding the sufficiency of the evidence on the attempted possession conviction, then, Alcantar focuses only on the alleged conspiracy to distribute cocaine between December 1992 and November 17, 1993. He points out that the only evidence linking him to Zapata's cocaine operation during that time came from Lopez, and he suggests that Lopez' testimony should have been disregarded because it was incredible as a matter of law.[1] Alcantar contends that without Lopez' testimony, no rational jury could have found the essential elements of the charged conspiracy beyond a reasonable doubt.

In considering a challenge to the sufficiency of the evidence supporting a conviction, we draw all reasonable inferences from the evidence in favor of the government, and we will reverse only if no reasonable jury could have found the defendant guilty of the charged offense beyond a reasonable doubt. *United States v. Wallace,* 32 F.3d 1171, 1173 (7th Cir.1994); *see also United States v. Henderson,* 58 F.3d 1145, 1148 (7th Cir.1995). That deferential standard of review is difficult for any defendant to overcome, but because Alcantar's sufficiency challenge primarily attacks a credibility determination, his task is even more difficult. Questions of witness credibility are reserved for the jury, and its assessments will not be second-guessed by an appellate panel. *See, e.g., Henderson,* 58 F.3d at 1148; *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). As a result, appellate attacks on the credibility of a trial witness are almost always unavailing. This court has deferred to a jury's judgment even where challenged testimony was completely uncorroborated and was offered, as in this case, by a paid informant with a sordid criminal past. *See, e.g., United States v. Saulter,* 60 F.3d 270, 275 (7th Cir.1995); *United States v. Beverly,* 913 F.2d 337, 358 (7th Cir.1990). When a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere, as the jury is the final arbiter on such questions. *See Henderson,* 58 F.3d at 1149; *United States v. Patterson,* 23 F.3d 1239, 1244 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994).

Only in the narrowest of circumstances will the defendant succeed on appeal in establishing that testimony credited by a jury was incredible as a matter of law. The defendant must show that the challenged testimony was unbelievable on its face, and that may be done in one of two ways—by showing that it would have been physically impossible for the witness to observe what he described, or impossible under the laws of nature for those events to have occurred at all. *See, e.g., Henderson,* 58 F.3d at 1149; *United States v. Van Wyhe,* 965 F.2d 528, 531 (7th Cir.1992); *Dunigan,* 884 F.2d at 1013. Testimony is not incredible as a matter of law, then, only because the witness may have been impeached by certain discrepancies in his story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government. *See Patterson,* 23 F.3d at 1244–45; *Van Wyhe,* 965 F.2d at 531; *United States v.*

---

1. Although the tapes also link Alcantar to the charged conspiracy, he contends that the recorded evidence also was influenced by Lopez, who

identified speakers on the tapes and helped translators create English transcripts of conversations that had taken place in Spanish.

*Blackman,* 950 F.2d 420, 424 (7th Cir.1991); *Dunigan,* 884 F.2d at 1014. Although a jury may certainly reject the testimony of a witness who was impeached in any or all of these ways, we will not disturb its refusal to do so unless the testimony is unbelievable on its face.

■ Lopez' testimony linking Alcantar to Zapata's cocaine operations is not unbelievable on its face, as there is nothing to suggest that the conduct described by Lopez was impossible under the laws of nature or that Lopez lacked any opportunity to observe that conduct. *See United States v. Sophie,* 900 F.2d 1064, 1079 (7th Cir.), *cert. denied,* 498 U.S. 843, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990); *United States v. Kuzniar,* 881 F.2d 466, 471 (7th Cir.1989). Indeed, because Lopez purports to have delivered kilogram quantities of cocaine to Alcantar on a regular basis between January and March 1993, he would have had ample opportunity to observe the conduct he described. Moreover, the tape-recorded conversations leading to the November 17 delivery and Alcantar's own actions prior to his arrest on that day support Lopez' story. Indeed, in the September 22 conversation, Alcantar revealed that he and Cano had moved between ten and fifteen kilograms of cocaine a week at the height of Zapata's operations. The series of conversations between Lopez and Cano also contemplated the continuation of earlier operations that had been halted first by the money dispute and then by the murders of Zapata and his subordinates. It is clear from the context of these conversations that Alcantar and Cano had a history of dealing narcotics with both Lopez and Zapata. That is further evidenced by Alcantar's call to the South Drake Street apartment on April 24. Finally, the arrangements made by Lopez, Cano, and Alcantar for the November 17 delivery were similar to the procedures employed by those three prior to Zapata's death. Thus, Lopez' testimony was consistent with and corroborated by the other evidence in the case.

Alcantar's objections to that testimony do not relate to physical impossibility or impossibility under the laws of nature, but to inconsistencies in the details of the testimony, to the fact that Lopez had lied to law enforcement authorities in the past, and to Lopez' personal motivation to lie in this case. Although such matters are relevant to an assessment of Lopez' credibility, they do not make his testimony incredible as a matter of law. *See Henderson,* 58 F.3d at 1149; *Blackman,* 950 F.2d at 424. Moreover, the matters referenced by Alcantar were fully aired to the jury on cross-examination, but the jury still chose to credit Lopez' story. That was a judgment the jury was privileged to make, and Alcantar has provided us with no basis for disturbing it. *Saulter,* 60 F.3d at 275; *Henderson,* 58 F.3d at 1149; *Sophie,* 900 F.2d at 1079. When Lopez' testimony is considered, the evidence at trial was plainly sufficient to support Alcantar's conviction for conspiracy.

## III.

■ Alcantar also contends that the district court should have granted his motion to supplement the record on appeal with transcripts of the earlier grand jury testimony of those witnesses who testified against him at trial. Although these transcripts were never before the district court, Alcantar argues that they are now necessary to enable him to advance a claim of ineffective assistance of trial counsel.[2] On May 17, 1995, the district court denied Alcantar's motion in a one-sentence minute order. Alcantar then renewed the argument in his primary brief before this court, again contending that the transcripts are necessary to enable him to evaluate and to advance a claim of ineffective assistance of counsel.

On October 16, 1995, however, after the merits briefing had been completed but prior to oral argument, Alcantar filed a motion in this court to modify the record pursuant to

---

**2.** Alcantar apparently is fearful that he may default such a claim by failing to raise it on direct appeal. As we explain below, however, and as the government conceded at oral argument,

there would be no default in this case because Alcantar's ineffective assistance claim depends upon materials outside the record of proceedings before the district court.

Fed. R.App. P. 10(e) and Cir. R. 10(b).[3] His motion stated that a similar request had been made but denied in the district court. A motions panel initially ordered Alcantar to file copies of the materials submitted to the district court on this issue along with a copy of the district court's order denying the motion. After reviewing those materials, the motions panel denied Alcantar's motion on October 26, 1995. By that order, the motions panel effectively ruled on the second issue raised by Alcantar in the merits briefing. Although a merits panel may always reconsider matters addressed previously by a motions panel (*see In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 279–80 (7th Cir.1996)), there is no reason for us to do so here. The materials Alcantar seeks to add to the record were never before the district court, and they cannot therefore be added to the record on appeal pursuant to Fed. R.App. P. 10(e). *See United States v. Hillsberg*, 812 F.2d 328, 336 (7th Cir.), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987); *Borden, Inc. v. FTC*, 495 F.2d 785, 788 (7th Cir.1974).

To the extent Alcantar may need the grand jury transcripts to develop his ineffective assistance of counsel claim, he may pursue such a claim in a collateral proceeding under 28 U.S.C. § 2255 and attempt to obtain the transcripts at that time. Where, as here, the ineffectiveness of trial counsel is not readily apparent from the trial record but could be shown only through reliance on outside evidence, a defendant need not raise his ineffectiveness claim on direct appeal.

He should instead pursue that claim in a collateral proceeding under section 2255. *See, e.g., United States v. Wiman*, 77 F.3d 981, 988–89 (7th Cir.1996); *Guinan v. United States*, 6 F.3d 468, 471 (7th Cir.1993); *United States v. Davenport*, 986 F.2d 1047, 1050 (7th Cir.1993); *United States v. Taglia*, 922 F.2d 413, 418–19 (7th Cir.), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991). That avenue remains open to Alcantar here.

AFFIRMED.

3. This court actually invited him to do so in its order of October 4, 1995:
The court notes that the appellant appears to have filed an unavailing Motion to Supplement the Record on Appeal with the District Court. The court further notes that motions to supplement the record on appeal, which are denied by the District Court, may be renewed by filing them with this court. See FRAP 10(e); Cir. R. 10(b).
The cited rules provide as follows:
If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.
Fed. R.App. P. 10(e);
A motion to correct or modify the record pursuant to Rule 10(e), Fed. R.App. P., or a motion to strike matter from the record on the ground that it is not properly a part thereof shall be presented first to the district court. That court's order ruling on the motion will be transmitted to this court as part of the record.
Cir.R. 10(b).