165 F.3d 34
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Rafael A. MARTINEZ a/k/a Victor Martinez, Jose Tineo,
Florencio Herpin, a/k/a Papo, and Arnaldo Garcia,
a/k/a Naldo, a/k/a Nardo, Defendants-Appellants.
 Nos. 96-4159, 97-1297, 97-1266, 97-1582.
 United States Court of Appeals, Seventh Circuit.
 Argued May 20, 1998.
Decided Sept. 1, 1998.
 
 Appeal from the United States District Court for the Eastern District of Wisconsin. No. 96 CR 58. Thomas J. Curran, Judge.
 Before Hon. WALTER J. CUMMINGS, Hon. DANIEL A. MANION, Hon. ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Rafael Martinez, Arnaldo Garcia, Jose Tineo, and Florencio Herpin operated a cocaine distribution organization in Milwaukee, Wisconsin between 1992 and 1994. Eventually, all four were indicted and convicted on various counts in the indictment, most notably conspiracy to possess with intent to distribute cocaine. On appeal, they raise many arguments to challenge their convictions and sentences, but none have merit and we affirm.
 
 I.
 
 2
 Martinez was the leader of a drug conspiracy in Milwaukee, Wisconsin. It was a full-service operation. He employed drug couriers who brought in cocaine from Chicago, New York, and elsewhere; crack "cookers" who transformed cocaine into crack cocaine for sale to individual users; salesmen; and security personnel. He ran at least twelve drug houses, and also sold drugs from the V & M Garage, where he operated a legitimate auto repair business.
 
 
 3
 Tineo acted as Martinez's right-hand man. He sometimes would accompany Martinez when Martinez was delivering cocaine to sellers; he also took Martinez's role in negotiating the purchase of cocaine from other suppliers. Herpin also negotiated the purchase of cocaine from suppliers. Garcia frequently went to Chicago to pick up cocaine to supply the conspiracy. He would generally pick up at least one kilogram of cocaine, paying in cash.
 
 
 4
 Eventually all four were charged in a single indictment. Garcia's trial was severed from the others due to a conflict of interest involving his attorney, and new counsel was appointed for Garcia. In September, 1996, Martinez, Tineo and Herpin were tried to a jury and convicted of conspiracy to possess with intent to distribute cocaine. Martinez was also convicted of one count of possession with intent to distribute cocaine, and Tineo was convicted of two counts of possession with intent to distribute cocaine. Martinez was sentenced to life imprisonment; Tineo, to 152 months' imprisonment; and Herpin, to 170 months' imprisonment. Two months later, Garcia was tried to the bench and convicted on one count of conspiracy to possess with intent to distribute cocaine, and six counts of possession with intent to distribute. He was sentenced to 188 months.
 
 II.
 
 5
 The defendants make several arguments on appeal. Tineo claims that the district court improperly denied his motion to suppress evidence seized during a consensual search of a hotel room. Tineo, joined by Herpin, challenges the admission of testimony by Kevin Brown. Tineo, Herpin and Martinez argue that improper, prejudicial comments made by two witnesses, Raymond Smith and Elizabeth Diaz, denied them a fair trial. Herpin also claims the evidence was insufficient to convict him. And finally, Martinez, Garcia and Herpin challenge their sentences.
 
 A. Tineo's Suppression Motion
 
 6
 Tineo contends that evidence seized in a South Milwaukee hotel room should have been suppressed by the district court because the police officers exceeded the scope of the consent to search. On September 15, 1993, Milwaukee Police Officer John Edwards and two other officers knocked on the door of Room 214 of the Exel Inn in Oak Creek, Wisconsin, a suburb of Milwaukee. Jeremy Clemente opened the door and Edwards asked Clemente if he could search the room for narcotics or drug paraphernalia. Clemente agreed, and the officers found a scale in an open box near a coat rack. Officer Edwards then opened a dresser drawer and found a package of sandwich baggies (used by drug dealers for packaging individual amounts of drugs). During the search, Clemente, Tineo, and a third man were sitting on the right side of one of the two beds in the motel room. Officer Edwards, upon finding the sandwich baggies, explained that voluntarily turning over any narcotics in the room would be in their best interests. No one responded, and Officer Edwards asked the men to move to the other side of the bed. Another officer then lifted up the right side of the bed and discovered narcotics. Officer Edwards immediately arrested all three men, and then continued to search the room; he also discovered cocaine under the other bed. At least, this is how Officer Edwards described the search during the suppression hearing. Tineo asserts that the officers merely asked to check the room, and Clemente did not consent to a search of the room for narcotics. The district court credited the testimony of Officer Edwards over the conflicting testimony of Clemente and Tineo, and refused to suppress the evidence seized in the motel room.
 
 
 7
 The "Fourth Amendment's general prohibition against the warrantless search of a person's property [does] not apply when the 'search [is] conducted pursuant to a valid consent." ' Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "We review the district court's findings of fact after a suppression hearing for clear error, while reviewing conclusions of law and mixed questions of law and fact de novo." United States v. Meyer, No. 96-4230, 1998 WL 334456 at * 11 (7th Cir. June 23, 1998). Thus, our review of the district court's determination that a search is consensual is deferential to the extent that it turns on a question of fact. United States v. Yusuff, 96 F.3d 982, 986 (7th Cir.1996). A third party with common authority over the premises sought to be searched may provide such valid consent. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The scope of the consent to search is generally determined by what the officers are searching for. United States v. Saadeh, 61 F.3d 510, 518 (7th Cir.1995) ("We first must determine the scope of [the defendant's] initial consent. The scope of a search generally is characterized by its expressed object.") (citations omitted). In assessing the reasonableness of the scope of the search in relation to the consent given, the district court may consider the contemporaneous failure to object to the search. United States v. Maldonado, 38 F.3d 936, 940 (7th Cir.1994).
 
 
 8
 The district court was entitled to believe Officer Edwards' testimony that he asked to search the room specifically for narcotics. The initial visual search of the hotel room turned up a scale, and further searching revealed sandwich bags in a dresser drawer. Additionally, no one objected when the police officers opened dresser drawers, or when they asked Tineo and Clemente to move away from the right side of the bed. Cf. Saadeh, 61 F.3d at 518 (The defendant "did not object to the search of his toolbox. In fact, he stood by and watched quietly as the agent opened it. That lack of protest undercuts a defendant's later challenge to a third party's authority to consent."). Given that the object of the search was narcotics, and items consistent with the sale of drugs were discovered, it does not seem objectively unreasonable to look under the mattress where Tineo had been sitting; therefore, the district court did not abuse its discretion in denying Tineo's suppression motion.
 
 
 9
 B. Tineo's and Herpin's Challenge to Kevin Brown's Testimony
 
 
 10
 Tineo and Herpin argue that the district court violated their due process rights by admitting the testimony of Kevin Brown, who had purchased cocaine from the conspiracy. Kevin Brown's testimony before the grand jury implicated only Martinez, and a week before trial, the prosecution stated that it would call Brown as a witness, but only as to Martinez. At trial, the prosecution asked Brown who in the courtroom he recognized. Brown then identified Martinez, and also Herpin and Tineo. During cross-examination, Brown testified that he did not mention Herpin or Tineo when he testified before the grand jury. This cross-examination suggested Brown's testimony implicating Herpin and Tineo was a recent fabrication.
 
 
 11
 Neither Herpin nor Tineo objected to the district court on due process or any other grounds with regard to Brown's testimony, so we review this claim only for plain error. Both Herpin and Tineo cross-examined Brown, and neither requested time either to prepare for cross-examination or for further investigation. Moreover, the defendants have failed to identify any prejudice resulting from their surprise. In fact, the situation was handled just as it should have been: The defendants were permitted to cross-examine Brown, to impeach his credibility or to develop the possibility that his identification of Herpin or Tineo was a recent fabrication. The defendants were able to explore Brown's conviction and agreement for a two-point reduction in sentence in exchange for testimony, which suggests that admission of Brown's testimony would have been at most harmless error, and certainly not plain error.
 
 C. Failure to Take Judicial Notice
 
 12
 A few days after Brown testified, Herpin and Tineo requested that the district court take judicial notice of a letter from the prosecution, written one week before trial, which stated that Brown would testify only against Martinez:
 
 
 13
 The only defendant in this case against whom Kevin Brown provided information was Victor Martinez, and Brown has stated on several occasions -including in the grand jury - that he purchased multi-kilogram quantities of drugs from Martinez.... As for the other defendants, Kevin Brown did not give information with regard to those individuals.
 
 
 14
 While the defendants styled the motion a request for judicial notice, see Fed.R.Evid. 201, what the defendants in fact sought was to have the government's letter read to the jury. This explains why the district court and the parties ignored the judicial notice question, and instead focused on whether the letter is admissible. We assume that the content of the letter is a proper subject for judicial notice if the letter is otherwise admissible. Cf. United States v. Severson, 3 F.3d 1005, 1012 (7th Cir.1993) (Court of Appeals takes judicial notice of letter from Assistant United States Attorney indicating that he may have exculpatory material). The district court concluded that the letter did not contradict Brown's testimony, and was therefore inadmissible hearsay. See Fed.R.Evid. 801(d)(1) ("A statement is not hearsay if -(1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony ...").
 
 
 15
 Herpin and Tineo contend, as they did before the district court, that this statement is relevant in establishing recent fabrication by Brown, and is not hearsay because it is an admission of a party opponent under Fed.R.Evid. 801(d)(2). We agree the statement is relevant, given the broad definition of "relevant evidence" under Fed.R.Evid. 401. We also agree that the statement might satisfy the requirements of Fed.R.Evid. 801(d)(2) (admission of a party-opponent), although the application of this rule to government attorney statements has been questioned. See United States v. Zizzo, 120 F.3d 1338, 1351 n. 4 (7th Cir.1997). We need not, however, reach this issue because even if Rule 801(d)(2) applied, the letter would remain inadmissible.
 
 
 16
 The letter contains "double hearsay," i.e., two layers of hearsay. The first layer is the out-of-court statement by the prosecutor discussed above. The second layer of hearsay involves Brown's testimony to the grand jury and statements to the government investigators. Brown, while testifying at trial, did not contradict the content of the prosecutor's letter. Rather, he acknowledged the omission of any testimony regarding Herpin and Tineo before the grand jury, and to investigators. Thus, this letter is neither a prior inconsistent statement, nor a prior consistent statement offered to rebut a charge of recent fabrication, Fed.R.Evid. 801(d)(1). Moreover, Brown's statements do not fall within any of the other exceptions to hearsay, including admission of a party-opponent (the defendants do not argue that Brown is an agent of the government), and the exception for business or public records (because Brown did not have an obligation to make these statements, and was not a public official). Therefore, the second layer of hearsay in the letter is inadmissible, and the district court did not abuse its discretion in refusing to read it to the jury. And admitting only the government's statements in the letter would be consistent with, and so merely cumulative of, Brown's testimony, and the district court properly excluded it under Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed ... by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").
 
 
 17
 D. Herpin's Challenge to the Sufficiency of the Evidence
 
 
 18
 Herpin also challenges the sufficiency of the evidence supporting his conspiracy conviction. When faced with such a claim, we review the facts in the light most favorable to the government, and will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Katalinich, 113 F.3d 1475, 1480 (7th Cir.1997). Herpin broadly challenges whether the government proved that he was knowingly involved in the conspiracy. In reviewing the record, we look for "whether the defendant's acts rendered support to the co-conspirators, whether the defendant was entrusted with some task that furthered the criminal design, or whether he entered into a mutually cooperative relationship with co-conspirators that assisted them in bringing about the object of a conspiracy." United States v. Magna, 118 F.3d 1173, 1200 (7th Cir.1997) (citation and internal quotations omitted). As noted above, Kevin Brown testified that Herpin was present at cocaine deals conducted by Martinez. Further, Raymond Smith, a drug courier working for Martinez, testified that Herpin would accept money from Smith in payment for drugs Smith had delivered to Martinez's various drug houses. This evidence certainly suggests that Herpin had knowledge of the Martinez cocaine conspiracy.
 
 
 19
 Additionally, evidence supports the conclusion that Herpin had agreed to participate in the conspiracy. Smith's testimony regarding Herpin's role in providing large quantities of cocaine for transport to Martinez's drug houses suggest that Herpin was Martinez's employee. The government also proved that Herpin took Martinez's place at a drug buy with a drug supplier, Mario Gonzales, at a motel called the Hospitality Inn. There, Herpin tasted the five kilograms Gonzales had for sale, and stated that Martinez would able to sell the cocaine. He even warned Gonzales that law enforcement officials were investigating the conspiracy. This evidence suggests that Herpin had been entrusted with a "task that furthered the criminal design." In short, Herpin was a "player" who supported the criminal design and wanted to make it succeed.
 
 
 20
 Herpin tries to lessen the overwhelming evidence against him by suggesting that Raymond Smith's testimony was incredible as a matter of law. However, Herpin merely points to Smith's bias and inconsistencies in his testimony. These are the sort of routine challenges to credibility which juries are charged with sorting out. United States v. Scott, 145 F.3d 878, 884 (7th Cir.1998). We will not redo the jury's work. In sum, we conclude that Herpin has not carried his "heavy burden" of demonstrating that based on the record, a rational trier of fact could not conclude that Herpin was a member of the Martinez cocaine conspiracy. See United States v. Alexander, 135 F.3d 470, 474 (7th Cir.1998) (the defendant "bears a heavy burden in challenging the sufficiency of the evidence").
 
 
 21
 E. Martinez, Herpin and Tineo Challenge the Denial of Their Mistrial Motion
 
 
 22
 Martinez, joined by Tineo and Herpin, also takes issue with Raymond Smith's testimony, claiming that Smith made an improper, prejudicial comment. Martinez also argues that another witness, Elizabeth Diaz, made a prejudicial statement, and that the cumulative effect of both of these statements denied him (and Herpin and Tineo) a fair trial.
 
 
 23
 Raymond Smith testified on the first day of the three-week trial. The prosecutor asked Smith how he met Martinez. Smith responded that he first met Martinez when Martinez was involved in a car accident in Smith's neighborhood. Smith testified that "they [Martinez and Herpin] had people moving the crowd away because they said they were going to shoot them." Martinez, Tineo and Herpin immediately objected and outside of the jury's presence, argued for a mistrial. The district court instructed the jury to disregard the testimony, struck the testimony from the record, and clarified to the jury that no weapon had been discharged, but it denied the motion for a mistrial. The district court did not abuse its discretion by refusing a mistrial. We presume jurors follow the court's instructions, United States v. Linwood, 142 F.3d 418, 426 (7th Cir.1998), and the defendants are only entitled to a fair trial, not a perfect one. United States v. Wilson, 134 F.3d 855, 867 (7th Cir.1998).
 
 
 24
 Martinez, Tineo and Herpin also contend that a stray comment made by a witness as she left the witness stand was prejudicial. Elizabeth Diaz sold cocaine for Martinez. She testified against Martinez, and after finishing her testimony she left the courtroom, passing by Tineo's counsel. Tineo's counsel heard her state "That's the murderer" as she passed by. (Diaz apparently believed that Martinez killed her boyfriend, Tito, but none of Diaz's testimony before the jury related to this). However, neither the judge, the court clerk, the court reporter, the prosecution, nor other defense counsel heard what Diaz may have said. On the basis of this investigation, the district court concluded that it was unlikely that the jury heard it. The district court also declined to poll the jury with regard to this comment, because polling the jury would only serve to highlight this stray, prejudicial remark. Again, the district court refused to grant the defense motion for a mistrial. In the absence of a strong probability that the jury heard the remark, and given that none of Diaz's testimony related to any shootings by Martinez, the district court did not abuse its discretion by refusing to poll the jury or otherwise making further inquiry into this.
 
 
 25
 Martinez also argues that Smith's stray remark, in combination with Diaz's stray remark, had a cumulative prejudicial effect upon the jury, and cannot be cured with limiting instructions. As we have already concluded that the prejudicial effect of Diaz's remark was negligible, we would be hard-pressed to say that the remark was prejudicial when combined with other evidence. Martinez cites United States v. Ham, 998 F.2d 1247, 1251 (4th Cir.1993), in support, but we see Martinez's case as having far less danger of unfair prejudice. In Ham, evidence of child abuse, homosexuality, and abuse of women was admitted into evidence during a trial on fraud and racketeering. The Fourth Circuit held that "we fear that jurors will convict a defendant based on the jurors' disdain or their belief that the defendant's prior bad acts make guilt more likely." Id. at 1252. The judicial evidence involved child molestation, and in fact, the Fourth Circuit cited two more cases involving child molestation for the proposition that some prejudice cannot be cured with a limiting instruction. Martinez further cites United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir.1996), which also involves improper accusations of child molestation cumulatively leading to a finding of error. While the idea of cumulative prejudicial error is not expressly limited to cases of child molestation, we must be convinced that the element of prejudice in this case is similarly inflammatory. Martinez can point to nothing which occurred in his trial which could be considered as inflammatory as an accusation of child molestation. The few details of the altercation brought before the jury cannot equate to the extensive evidence of child molestation allowed in Ham and Frederick. And Diaz's comment, which probably had not been heard by the jury, did not specifically refer to Martinez or to the victim of the alleged murder. If these minor errors compel a mistrial, the exception would swallow the rule and few trials would result in any verdict whatsoever.
 
 
 26
 F. Martinez, Garcia, and Herpin's Challenges to Sentencing
 
 
 27
 Martinez, Garcia and Herpin challenge the drug quantities attributed to them by the district court. Martinez and Garcia also challenge sentence enhancements for possessing firearms and in Martinez's case, for being a leader or organizer. We review sentence enhancements and calculations of drug quantities for clear error, and will affirm unless we are "left with the definite and firm conviction that mistake has been committed." United States v. Hall, 109 F.3d 1227, 1233 (7th Cir.1997). In assessing the defendants' relevant conduct, the district court is to consider "all acts and omissions committed, aided, abetted, considered, commanded, induced, procured, willfully caused by the defendant; and in the case of a [conspiracy] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(A) & (B). The district court is to examine evidence such as "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." United States v. Beler, 20 F.3d 1428, 1433 (7th Cir.1994) (citing U.S.S.G. § 2D1.1 application note 12). The government must establish these acts by a preponderance of the evidence. United States v. Howard, 80 F.3d 1194, 1202 (7th Cir.1996).
 
 
 28
 The district court found Martinez responsible for selling in excess of 150 kilograms of cocaine. Surveillance tapes recorded Martinez stating that he sold 10 to 15 kilograms of cocaine per week. While this evidence does not indicate for how long a period he averaged such sales (and we doubt it was for the entire two years he operated the conspiracy), even a sizable discount of this evidence of sales would support the district court's finding that Martinez was responsible for at least 150 kilograms of cocaine. Further, records seized from Martinez's home revealed drug transactions in excess of $700,000 over a two-month period. While it is unclear from the record whether the transactions were wholesale or retail, this evidence certainly lends some support to Martinez's own estimate. Additionally, Raymond Smith testified that he cooked crack cocaine out of approximately 70 kilograms of cocaine, and he was not Martinez's exclusive cocaine cooker. Further, this evidence pertaining to specific drug quantities must be examined in light of the conspiracy as a whole. Beler, 20 F.3d at 1433. During this time, Martinez repeatedly bought multiple kilograms of cocaine and reinvested the proceeds from the sale of the cocaine into more cocaine. He also operated a massive operation, with over twelve drug houses, several employees and a working drug laboratory, for two years. Given this, and all the other evidence in the record, the district court's finding was not clearly erroneous.
 
 
 29
 On appeal, Herpin attacks the district court's finding that "five to fifteen kilograms [of cocaine] is clearly established by a preponderance of the evidence." However, Herpin concedes that the government adequately linked him to the five-kilogram transaction which occurred at the Hospitality Inn, and he merely challenges other evidence that would bring him over the five-kilogram amount. This concession of Herpin's involvement with five kilograms of cocaine is fatal to his claim because the Sentencing Guideline provides the amount of cocaine must be "[a]t least 5 KG but less than 15 KG of Cocaine." U.S.S.G. § 2D1.1(4). Despite this unambiguous language, Herpin incorrectly asserts that the Guideline "mandates that the possession of more than five, but less than fifteen, kilograms of cocaine yields" the base offense level found by the district court. (The sentencing transcript, however, reveals that the trial counsel correctly understood § 2D1.1(4)). As the district court had to find at least five kilograms to be affirmed, and Herpin concedes that such a finding is supportable, Herpin's argument is legally flawed and utterly without merit.
 
 
 30
 The district court found Garcia responsible for 15-50 kilograms of cocaine. Again, Garcia principally argues that the district court improperly relied on testimony by Raymond Smith. Smith testified that Garcia would accompany him to Chicago three to four times per month to pick up between two and eight kilograms of cocaine, for a period of eighteen to twenty-four months. This evidence establishes that Garcia is responsible for far more than 15 kilograms of cocaine. Also, Smith testified that he "cooked" at least 70 kilograms of cocaine at a laboratory in Garcia's house. The district court accepted this evidence, and it clearly supports the district court's determination of the relevant drug quantities.
 
 
 31
 Garcia asserts that because the district court relied on the testimony of Raymond Smith, a convicted drug dealer whose testimony is uncorroborated, the district court's finding of this fact is clearly erroneous. This court will discredit a credibility determination only if the defendant establishes that the testimony was incredible as a matter of law. United States v. Alcantar, 83 F.3d 185, 189 (7th Cir.1996). Testimony is incredible as a matter of law if "it would have been physically impossible for the witness to observe what he described, or impossible under the laws of nature for those events to have occurred at all." Id. We will not disturb a credibility determination even if the testimony is totally uncorroborated and comes from an admitted liar, a large-scale drug dealer, a convicted felon, or an individual with a motive to provide evidence favorable to the government. Id.; United States v. Saulter, 60 F.3d 270, 275 (7th Cir.1995). Here, the district court found Smith to be credible, and as no grounds exist to disregard the district court's credibility findings, we must affirm the district court.
 
 
 32
 Garcia and Martinez both challenge the district court's finding that they possessed firearms in connection with the drug conspiracy, which resulted in a two-point enhancement under the Sentencing Guidelines. Smith testified that Garcia would always carry a gun when he went to pick up drugs in Chicago. The district court found Smith to be credible, and Smith's testimony was not impossible or so fantastic that no reasonable trier of fact could accept it as true. Again, we see no clear error by the district court.
 
 
 33
 The district court also imposed a two-point sentence enhancement against Martinez for possessing a firearm. Martinez contends that there is no evidence that he "used or displayed a firearm during any of the [drug] transactions." This argument might have some force if Martinez had been charged under 18 U.S.C. § 924(c), which criminalizes using or carrying a firearm in the commission of a drug felony, but the standard under U.S.S.G. § 2D1.1(b)(1) is different. "The Guidelines require a district court to apply this adjustment if a weapon was present, unless it is clearly improbable that the weapon was connected with the offense. See U.S.S.G. § 2D1.1(b)(1), comment. (n.3)." United States v. McClinton, 135 F.3d 1178, 1193 (7th Cir.1998). When officers searched Martinez's residence and the V & M Garage, they found several guns, drug money from a controlled buy, a digital scale, and empty bottles of Inositol, a substance frequently "cut" (mixed) with cocaine. This evidence supports the district court's finding that Martinez possessed the weapons while buying and selling drugs.
 
 
 34
 We're not done, because Martinez also challenges the district court's decision to impose a four-point enhancement for his role as leader or organizer of a conspiracy. Rather, he contends that he was a supervisor or manager, and implies that someone else gave orders to him: "There was evidence from several witnesses that another individual, from Chicago, who was specifically described by witnesses, appeared from time to time to confer with Martinez." But Martinez gives us no citations to the record to support this assertion, and we will not scour the record to see if this claim can be substantiated. See Federal Rule of Appellate Procedure 28(a)(6) (argument must be supported by "citations to the authorities, statutes, and parts of the record relied on."). We have refused to consider unsupported or cursory arguments. See, e.g., United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991). Furthermore, the district court had substantial evidence before it that Martinez controlled many employees, negotiated purchases of cocaine and supervised the process of creating crack cocaine, and maintained drug houses for the purpose of selling cocaine, all of which suggests that the district court's enhancement was not plain error.
 
 III.
 
 35
 In short, none of the appellants' arguments have merit, so each of their respective convictions and sentences are AFFIRMED.