In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-2333, 07-2336, 07-2338, 07-2366 & 07-2385

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN ALVIAR, RODOLFO MADRIGAL, JOSE MELERO,
APOLINAR DELGADO-RIOS, and SAUL TEJEDA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 194—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 15, 2009—DECIDED JULY 23, 2009

Before FLAUM, RIPPLE, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Saul Tejeda, Juan Alviar, Jose
Melero, Rodolfo Madrigal, and Apolinar Delgado-Rios
were among a group of individuals indicted in connec-
tion with an Aurora, Illinois drug conspiracy. While most
of the indicted individuals pleaded guilty, those five
defendants went to trial, where a jury convicted each as
charged. Tejeda is serving a 360 month prison sentence;

Alviar and Melero are serving 262 months; Madrigal is serving 240 months; and Delgado-Rios is serving 121 months. Defendants appeal various aspects of their consolidated trial and their sentences. We affirm on all counts.

## I. Background

In 2003, FBI agents began investigating a suspected drug conspiracy in Aurora. The investigation focused on Tejeda and his associates. The investigation eventually employed cooperating witnesses; pen register information from specific telephones; a court-authorized wiretap; ongoing police surveillance; and several searches.

Based on evidence obtained, a grand jury returned its second superseding indictment on November 17, 2005. The indictment charged seventeen individuals, including Tejeda, Alviar, Melero, Madrigal, and Delgado-Rios, with conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846 (Count One). The indictment charged Tejeda alone with five counts of distributing cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts Two through Five, Seven); four counts of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Counts Six, Eight through Ten); and one count of laundering narcotics proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Eleven). It charged Tejeda and Alviar with two counts of attempting to possess cocaine in violation of 21 U.S.C. § 846 (Counts Twelve and Thirteen). Tejeda, Melero, and Madrigal were charged with two counts of using a telephone to facilitate a narcotics

conspiracy in violation of 21 U.S.C. § 843(b) (Counts Seventeen and Eighteen). The indictment charged Alviar, by himself, with three counts of possession of cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts Fourteen through Sixteen). Melero was charged individually with two counts of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Counts Nineteen and Twenty). Delgado-Rios was charged individually with two telephone counts in violation of 21 U.S.C. § 843(b) (Counts Twenty-Three and Twenty-Four).

The indictment stated that between 2000 and March 2005, Tejeda was a wholesale distributor of cocaine in Aurora, and he obtained and resold cocaine in kilogram and ounce quantities. According to the indictment, Tejeda's co-defendants assisted him. Tejeda, Alviar, Melero, and Madrigal first were members of the Latin Homeboys street gang, and then they became members of the Latin Kings, while Delgado-Rios was part of Tejeda's close family circle. Tejeda relied on his fellow gang members and close family to serve as lookouts, to direct him to customers, to store and transport cocaine and money for him, and to help him steal cocaine from others. The indictment further alleged that Tejeda's gang membership provided his operation with protection from rivals; specifically Alviar and Melero specialized in providing protection through their positions as Latin King enforcers.

Tejeda and Melero moved pretrial to exclude gang membership evidence as unduly prejudicial and of minimal probative value. According to Tejeda, "evidence that

defendants are members of the Latin Homeboys or Latin Kings is not especially probative of whether they jointly ventured to distribute drugs to further the criminal interest of the Latin Homeboys or Latin Kings," and "the missing link between the 'gang' and the 'criminal activity' distinguishes this case from other cases where gang evidence was found admissible for the purpose of establishing a joint venture or the existence of a conspiracy."

The government in its consolidated response to defendants' pretrial motions responded that: "[G]ang membership in this case is part of the glue that held the charged conspiracy together, and is therefore part-and-parcel of the proof necessary to demonstrate that defendants had a criminal intent and agreement to conspire." The government added that it would present witnesses to testify that "the Aurora Latin King's greatest source of revenue was proceeds from cocaine sales, a fact supported by the conspiracy evidence in this case."

On May 3, 2006, the district court denied defendants' motions to exclude evidence of gang membership without placing restrictions on the prosecution's use of gang-related evidence. On May 9, Delgado-Rios filed a motion objecting on Rule 403 grounds to "[a]dmission of gratuitous gang activities." The court denied the motion without prejudice to raising the same objection at trial.

Defendants' consolidated trial commenced on May 16, 2006. It spanned eleven days. In its opening statement, the government described Tejeda's cocaine trafficking organization and its relation to gangs: "One of the key

ways defendant Saul Tejeda protected himself and his drug organization is by joining the Latin Kings street gang in Aurora."

The government introduced testimony of law enforcement officers, lay witnesses, and cooperating defendants. The government had wiretapped a telephone used by Tejeda, and it played 189 calls at trial. It also introduced seventeen undercover recordings made by cooperating witnesses, which documented controlled purchases of one ounce of cocaine from Tejeda on February 4 and February 11, 2004; a sale by Tejeda of 2.8 grams of cocaine on October 5, 2004; two sales of cocaine by Tejeda on October 8, 2004; and a one ounce purchase on November 18, 2004. The recordings documented the possession of two ounces of cocaine by Tejeda and Alviar on February 11, and their attempt to purchase ten kilograms of cocaine on February 15, 2005. They captured Alviar's statement that he was a "hood enforcer" for the Latin Kings and that Melero was the "enforcer."

The government introduced evidence that a search of Melero's house upon his arrest revealed a 9 mm pistol and an SKS assault rifle. Searching Alviar's house, agents discovered drug paraphernalia and over 300 grams of cocaine. There was evidence that, after his arrest, Delgado-Rios stated that he was a money courier for a drug dealer, that he purchased cocaine for personal use, and that he had provided leads for drug robberies.

Cooperating defendant Andy Lopez testified that he was a gang member with Alviar, Melero, Madrigal, and Tejeda, as well as Tejeda's roommate. He testified he

had known Tejeda was selling cocaine since at least 2000. He witnessed Tejeda storing quarter-kilograms of cocaine in their apartment, along with guns, a scale, and baggies. Later, Tejeda would store cocaine with Lopez for him to sell. Tejeda additionally rented an apartment for Lopez in which to store cocaine and cash. In June 2004, authorities raided and seized about half a kilogram of cocaine.

Lopez testified that Tejeda had admitted robbing another drug dealer to him. He also testified about a drug robbery he committed with Melero, and about other robberies Melero had attempted. He testified that Madrigal purchased cocaine from Tejeda. Lopez witnessed Tejeda discussing the purchase of cocaine from Delgado-Rios and from Melero. He witnessed Alviar sell two ounces of cocaine to Tejeda. Lopez made a series of recordings with some of the defendants. On cross-examination, Lopez stated that he did not know what the Latin Kings had to do with the drug conspiracy on trial.

Another cooperating defendant, Carlos Escalante, testified that he had known Tejeda since 1998 and Alviar since 2004. Escalante had long been a Latin King, and he testified about the gang and the position of enforcer. According to Escalante, the primary source of income for the Aurora Latin Kings was cocaine distribution. He testified about the takeover of the Latin Homeboys by the Latin Kings. Escalante began selling cocaine upon release from prison in 2004, buying from Tejeda once or twice a week until October 2004. Escalante and Tejeda were

intercepted negotiating cocaine transactions; Escalante interpreted the recordings for the jury. Escalante also testified to seeing a handgun, cocaine, and a scale at Tejeda's house.

Cruz Samaniego next testified as a cooperating defendant. Tejeda's cousin, Samaniego had been a member of the Latin Homeboys since 1999. He described how Tejeda was a Latin Homeboy in 1996 and 1997 and how Alviar, Melero, and Madrigal were Latin Kings. Samaniego bought cocaine from Tejeda, Alviar, and Melero. Samaniego and Tejeda were intercepted on the wiretap negotiating cocaine transactions.

Heriverto Rios cooperated and testified that he was a former Latin Homeboy and had known defendants for years. He testified about drug robberies that he had been told about involving Tejeda, Melero, Madrigal, and Delgado-Rios. Rios testified that Tejeda supplied Delgado-Rios with cocaine, and that Alviar, Melero, and Madrigal also sold cocaine.

Under immunity, Carlos Olivares testified he was a Latin King from 1989 through 2004. He stated that a Latin Kings enforcer carries out punishments within the gang and ensures gang members have firearms. He testified that in December 2003 he witnessed Alviar, armed, performing security for a Latin Kings meeting. In March 2004, Olivares recorded a conversation in which Alviar stated that he was the "hood enforcer" and Melero was the enforcer. Olivares recorded Melero acting in that capacity.

Defense counsel objected to gang evidence throughout the trial, which included some 600 references to defen-

dants' Latin Kings associations, and some 100 references to defendants' Latin Homeboys affiliations. Delgado-Rios' counsel made the following statement, which is indicative of defense attorneys' objections:

> I made a motion in limine regarding the gang violence and activities. And I'm aware that there's several paragraphs in Count One that say the structure of the Latin Kings is being utilized in some fashion. And I argued to your Honor that the structure of the gang is not being used. There's no nation days. There's no—money is not going to any treasurer. . . . We don't have spots where people are manning it 24 hours a day, none of that stuff. Now, today—and we had a little bit of an opening statement and then with this agent. We started going back to like the Latin Kings is some national enterprise that everyone in the world should be afraid of. And he starts out big, you know, at the academy we learned about the Latin Kings, their organization and structure. Well, you know, that is so prejudicial to this group that's in a small—we're going to get a Mapquest, and it's going to be about a half a mile square. That's what this case is about, that half mile square. And I feel rivalries between gangs, shootings between gangs, it's all right to say you're carrying a gun to protect money or drugs, but for protection from other gangs as if there's some kind of struggle in Aurora over drug turf is not in this case. It's extremely prejudicial, Judge. . . .

After some additional back-and-forth, Delgado-Rios's counsel moved for a mistrial. The district court denied

defense counsel's motion, but it did address the government: "I don't want these people being, you know, dragged into some sort of national gang conspiracy, because that's not what it is. That's not what you've represented it to be. That's not what you've alleged in the indictment, and it's not what will be admitted in this case."

During Lopez's testimony, counsel objected to testimony about "gang stuff and the gang structure," and to testimony about the role of enforcer. The district court overruled the objection, saying "I know there's a line that can be crossed, and I'll keep my ears open for that. But I haven't seen it yet." The court allowed testimony about the role of enforcer, saying, "It was a pretty general question about rank and what that means, what those terms mean, but without any graphic detail, gratuitous or otherwise . . . ."

In response to an additional objection about testimony regarding gangs and "gang violence," the government explained that the evidence would show "the nature of the relationship between defendants Saul Tejeda and Juan Alviar . . . . Alviar had a particular role in this drug conspiracy, and the role was to protect Saul Tejeda . . . ." The district court overruled the objection and stated, "I think the government should be allowed the opportunity to try to put this mosaic together if they can. And if they can't, we'll deal with that in due course."

Later, in responding to objections about gang evidence, the district court stated that it had already ruled that the evidence would be admitted, but admonished the gov-

ernment to lay a better foundation for the testimony. The court continued, "As far as the gang being part of this case, it is part of this case. It's not in the traditional sense . . . that . . . I have dealt with in some other cases. It is part of this case."

Post-trial, the district court again addressed the gang evidence, stating:

> I ruled earlier, and I see no reason to change my ruling now, that this evidence was proper as admitted in this case to show the interrelationship among these defendants, especially since this was a conspiracy case, and the theory of the case was that the gang and the changing from the Home Boys to the Latin Kings by some of the defendants, not all of the defendants[,] was integral to understanding the interrelationship between these defendants. The evidence was limited, and it wasn't introduced for the purpose and didn't in my view unduly prejudice these defendants. The evidence clearly established who was and who wasn't a gang member and what gang they were affiliated with and the extent of the gang activity that related to the charged conspiracy. I don't minimize or belittle the defendants' concern about this. I know this is evidence that could be highly prejudicial if it were not otherwise relevant. I just think it was in this case . . . . [I]t was part of the interrelationship between these people.

The jury returned its verdict on June 19, 2006. Alviar, Madrigal, Melero, Delgado-Rios, and Tejeda were convicted as charged in the second superseding indictment.

Between August 9 and August 18, 2006, Alviar, Madrigal, Melero, Delgado-Rios, and Tejeda moved for judgment of acquittal and/or a new trial. The district court denied those motions. The court sentenced appellants on May 24, 2007.

## II. Analysis

Alviar, Madrigal, Melero, Delgado-Rios, and Tejeda filed notices of appeal. We consolidated defendants' appeals and instructed them to file a joint brief covering common issues, and to file individual supplemental briefs if necessary. In their joint brief, defendants argue that the district court abused its discretion in allowing evidence of gang membership. We address that common issue first. Defendants then raise various other challenges to their trial and sentences in their individual supplemental briefs, which we address in turn, providing additional background information when it is needed.

### A. Whether the district court abused its discretion in allowing evidence of gang membership.

Defendants claim that the district court abused its discretion when it: (1) allowed the introduction of unduly prejudicial gang evidence; (2) placed no limits on the introduction of gang evidence; and (3) failed to analyze such evidence under Fed. R. Evid. 404(b). They claim that the court at the pretrial stage overlooked Seventh Circuit case law that such evidence is prejudicial. They continue that during the trial, the court never "made the

difficult calls that are required by Fed. R. Evid. 404(b)." Defendants cite several Seventh Circuit cases to support their argument. *E.g.*, *United States v. Hardin*, 209 F.3d 652, 663 (7th Cir. 2000) ("Charging a drug conspiracy that involves gang members . . . does not give the government carte blanche to splash gang references throughout the trial."); *United States v. Irvin*, 87 F.3d 860, 865 (7th Cir. 1996); *United States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir. 1991) ("[E]vidence of membership in a street gang is likely to be 'damaging to [a defendant] in the eyes of the jury.'") (quoting *United States v. Lewis*, 910 F.2d 1367, 1372 (7th Cir. 1990)).

The government acknowledges that evidence of gang affiliation may be highly prejudicial, but it argues that such evidence is admissible when relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members. The government cites *United States v. Suggs*, 374 F.3d 508, 516 (7th Cir. 2004), to argue that gang evidence is "particularly relevant" in conspiracy cases, where the relationships of the defendants is a central issue. It claims that the district court did place limits on the gang evidence, and the evidence admitted was not unduly prejudicial. The government also contends that defendants forfeited their Rule 404(b) argument and in any event the gang evidence was not 404(b) evidence.

Our review of the district court's gang evidence decisions is for abuse of discretion. *Rodriguez*, 925 F.2d at 1053. "We give special deference to a trial judge's evidentiary rulings 'because of the trial judge's first-hand expo-

sure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding.'" *United States v. Hernandez*, 330 F.3d 964, 969 (7th Cir. 2003) (quoting *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998)).

We have recognized there is "substantial risk of unfair prejudice attached to gang affiliation evidence," but "under appropriate circumstances, gang evidence has probative value warranting its admission over claims of prejudice." *Irvin*, 87 F.3d at 864. In the Seventh Circuit, "[e]vidence of gang affiliation is admissible in cases in which it is relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members" and each defendant's knowledge of and participation in the drug conspiracy. *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997). "Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue" such as in a conspiracy case. *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) (affirming ruling allowing gang evidence because that evidence "helped demonstrate the existence of the conspiracy and the connections between members of the conspiracy"); *see also United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996) ("[G]ang membership can be key to establishing criminal intent or agreement to conspire.").

In this case, the evidence that the government submitted was relevant to proving the conspiracy allegations set forth in the indictment. The evidence established

that Tejeda was a drug dealer who employed a network of associates to obtain and to distribute the drugs, and that the majority of individuals that made up the network were in the Latin Homeboys and/or the Latin Kings with Tejeda. For example, the evidence established that Alviar and Melero had been Latin Homeboys with Tejeda, and later became Latin Kings with Madrigal and him. The fact that these four individuals were bound together by their gang membership made it more likely that they participated in a conspiracy. Testimony also established a link between gang membership and protection. While Tejeda once had expressed concerns about being robbed, after he became a Latin King, he did not express the same concerns. The evidence supported the argument that he no longer was concerned because Alviar and Melero, as Latin King enforcers, provided protection.

Madrigal cites *United States v. Avila*, 465 F.3d 796, 798 (7th Cir. 2006), to argue that the government and the district court confused evidence of membership in the gang with evidence of membership in the conspiracy. In that case, there was "negligible evidence" that the defendant belonged to a gang, but even if the defendant was a gang member, there was "no evidence" that he was a part of the conspiracy; the trial court erred in assessing his relevant conduct based on gang membership alone. Here, by contrast, the government elicited testimony to show that Tejeda's drug trafficking operation used gang members in certain defined roles. The government did not simply equate any membership in the gang with being a co-conspirator. The government's use of gang evidence was not improper in the instant case.

Defendants argue that, even if it was proper for the district court to admit some gang evidence, the court should have placed additional limits on the gang evidence that the government sought to introduce. They claim that the court permitted the government to do much more than simply "complete the story" of how the defendants came to know each other. For example, defendants argue that the court should have limited the evidence so that the government did not mention specific gang names or launch into a litany of violent acts both by and against the defendants.

As a preliminary matter, we note that the district court in fact did place certain limits on the gang evidence. In some instances, the court kept out gang evidence that was either irrelevant or unduly prejudicial. For example, when the government sought to admit a table bearing gang graffiti recovered from Melero's basement, the court barred its admission. When the government elicited testimony from an FBI case agent that of the hundreds of witnesses he had interviewed "virtually all" had tied the gang's activities to drug dealing, the court sustained an objection and instructed the jury to disregard the answer. When the government elicited testimony from Escalante about Latin Kings' drug dealing, the court allowed Escalante to testify to the gang's activities when he was involved, while sustaining objections to testimony about gang activities while he was incarcerated. The court admonished the government to elicit a specific foundation for testimony about gang activities: "They're holding you to your proof. You know, they haven't held you to . . . the letter of the rules of evidence for every-

thing in this case, but this time they are. This is a very sensitive subject, and I think you have to lay the foundation properly when you ask him or anybody else in this case for this type of testimony."

The evidence that the district court admitted was probative of defendants' roles in the Tejeda drug organization. Even the evidence of Latin King handshakes, symbols, colors, and tattoos tended to establish gang membership or affiliation, and it was proper for the government to prove gang membership as part of the conspiracy. Thus, we do not conclude that the court abused its discretion when it did not further limit the government's evidence.

Finally, defendants' argument that the district court failed to analyze the gang evidence under Rule 404(b) was forfeited, as it was never raised below, and we review it for plain error. *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008). The contested evidence proved specific portions of the indictment. It did not concern "other crimes, wrongs or acts," but it concerned the charged crime. When evidence is embraced by the conspiracy in the indictment, the court need not resort to Rule 404(b) analysis. "Rule 404(b) is inapplicable where the 'bad acts' alleged are really direct evidence of an essential part of the crime charged." *United States v. Lane*, 323 F.3d 568, 579 (7th Cir. 2003). The gang evidence was not actually Rule 404(b) evidence, and the court did not commit plain error when it did not analyze the evidence under Rule 404(b).

### B. Whether the district court properly refused to sever defendant Madrigal, who was indicted as a co-conspirator.

On August 18, 2005, Madrigal filed a motion for severance and a separate trial under Fed. R. Crim. P. 14, arguing that he would be prejudiced by undergoing a trial where there was "a gross disparity in both the amount and type of evidence against Madrigal vis-a-vis his co-defendants." A joint trial, Madrigal claimed, would be "fundamentally unfair." The government filed its response on the severance issue on February 10, 2006. On May 10, in its Pretrial Hearing Order, the district court denied Madrigal's motion for severance.

Madrigal appeals denial of his severance motion. He argues that the district court should have severed him because of: (1) "spillover" of the government's evidence; (2) prejudicial effect of inflammatory evidence of racial slurs by defendants; (3) prejudicial gang membership and violence evidence; and (4) "other crimes" and weapons evidence only relevant to other defendants.

Madrigal never renewed his motion at the close of the evidence. According to our case law, unless a motion to sever is renewed at the close of the evidence, it generally is waived. *See United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). A waiver of this nature would preclude appellate review of any kind. *See United States v. Olano*, 507 U.S. 725, 733 (1993). However, the failure to renew a motion to sever may be excused if the defendants can "demonstrate that refiling [the motion to sever] would have been . . . futile." *United States v. Caudill*, 915 F.2d 294,

298 (7th Cir. 1990). Madrigal does not explicitly argue that renewing the motion to sever would have been futile, but he does state: "[C]ontrary to the government's claim that the issue was not preserved by a renewed motion at the close of the evidence, the district court had been apprised of the issue for so long, both before and during the trial, the district court had to be fully aware that severance was still a viable, pending issue for Madrigal which could still be remedied by spinning his separate trial off to another occasion." In this case, the defense constantly challenged the admission of gang-related evidence—before, during, and after trial—on the grounds that it was prejudicial. One more motion may have been futile, but we need not decide whether Madrigal's motion to sever was waived, as our answer to that question is not outcome determinative.

Even if Madrigal's entire motion to sever was not waived, his second, third, and fourth arguments on appeal are forfeited. Madrigal never argued below that the district court should have severed him because of (2) the prejudicial effect of other defendants' use of racial slurs on the wiretap recordings; (3) the prejudicial nature of the gang evidence introduced at trial; and (4) the prejudicial effect of certain evidence against Alviar, Melero, and Renteria. We review arguments (2), (3), and (4) for plain error. We review argument (1), that the district court should have severed him because of the spillover effect from evidence against co-defendants, for abuse of discretion. *See United States v. McClurge*, 311 F.3d 866, 871-72 (7th Cir. 2002).

In all but the "most unusual circumstances," the risk of prejudice arising from a joint trial is "outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all." *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir. 1985). There is a strong preference that co-conspirators be jointly tried, particularly when they were indicted together. *See United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003). Joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1992) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10, (1987)). A district court has discretion to sever counts or defendants for trial. Fed. R. Crim. P. 14(a). We will overturn a denial of a motion to sever only if actual prejudice resulted. *Souffront*, 338 F.3d at 831.

Madrigal's first argument relates to the spillover effect of the evidence against his co-defendants. He claims that the district court overlooked the "massive amount" of evidence, witness testimony, and intercepted telephone call trial evidence targeted at proving the guilt of his co-defendants to his prejudice. But the fact that the government has greater evidence against one co-defendant does not automatically give the other defendant grounds for severance. *United States v. Studley*, 892 F.2d 518, 524 (7th Cir. 1989). Given that Madrigal was charged in a conspiracy with his co-defendants, most evidence offered at trial would have been admissible in a trial against him alone. The jury was instructed to consider each defendant separately. It did so and convicted Madrigal of a lesser drug quantity than his co-defendants. There

was no actual prejudice to Madrigal on account of "spillover" evidence because the jury distinguished between him and his co-defendants. *United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002).

One of Madrigal's forfeited arguments is that he should have been severed because the tape recordings showed that defendants used variations of the "N" word when speaking. Madrigal argues that the remarks were "racially offensive," and that his co-defendants used the terms more than he did. But, as the district court stated, the use of the terms "occurred during the conversations, and it was the manner in which they spoke to each other during the pertinent conversations." The court found that the terms were not meant to be racially offensive. The court also concluded it would not have been feasible to redact offensive words from hundreds of recordings. It was not plain error for the court not to sever Madrigal based on defendants' use of those words in recorded conversations. He did not suffer actual prejudice, as there was ample evidence against Madrigal and the jury was properly instructed to distinguish between co-defendants. Similarly, Madrigal's additional arguments do not demonstrate that the district court plainly erred when it denied Madrigal's motion to sever.

### C. Whether the district court properly accepted the government's *Santiago* proffer.

Delgado-Rios raises a claim related to the government's *Santiago* proffer. Under Fed. R. Evid. 801(d)(2)(E), a "statement is not hearsay if . . . [t]he statement is offered

against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978), we decided that when a statement of a co-conspirator which otherwise would be regarded as hearsay is proffered by the government, Fed. R. Evid. 104(a) requires that the district court make a preliminary determination regarding the admissibility of the declaration. We made clear that as a condition for admission of such statements, the government must convince the court, by a preponderance of the evidence, that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement(s) sought to be admitted were made during and in furtherance of the conspiracy. *Id.* at 1133-34; *see also United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991). The government may submit evidence of these elements in a pre-trial proffer, and the district court may admit the statement(s) subject to its later determination during trial that the government has established by a preponderance of the evidence the three foundational elements. *Santiago*, 582 F.2d at 1131. These evidentiary submissions are known as "*Santiago* proffers."

Delgado-Rios argues that the district court erred by accepting a "woefully inadequate" *Santiago* proffer. He claims the proffer was "in the most general terms" and "perfunctory." Findings under Fed. R. Evid. 801(d)(2)(E) based on a *Santiago* proffer are reviewed for clear error. *United States v. Rodriguez*, 975 F.2d 404, 411 (7th Cir. 1992).

The government's written proffer contained a preview of the evidence as to all defendants, including Delgado-Rios.

The proffer summarized cooperator Lopez's anticipated testimony, stating Lopez "knew co-defendant Apolinar Delgado-Rios to buy cocaine from Tejeda and resell it. Lopez also knew Tejeda to front cocaine to Delgado-Rios. Lopez also knew Delgado-Rios to pass along information to Tejeda about who was storing cocaine and where it was being stored so that Tejeda and others could commit drug robberies, in exchange for a portion of the robbery proceeds." The proffer summarized Rios's testimony that "Tejeda distributed a minimum of two ounces of cocaine to co-defendant Apolinar Delgado-Rios . . . at least three times a month. Rios also saw Delgado-Rios resell the cocaine he bought from Tejeda to other persons." The proffer included summaries of calls that recorded Delgado-Rios and Tejeda carrying out their drug business. Based on the information in the proffer, the district court did not commit clear error in concluding that the government had met by a preponderance of the evidence the preconditions for admission of co-conspirator statements.

**D.  Whether the district court committed plain error in allowing Agent Camacho to testify about the prior consistent statement of a witness who was alleged to have fabricated testimony about Delgado-Rios.**

Delgado-Rios next raises his first evidentiary error claim. Cooperating witness Rios had testified that Delgado-Rios had complained about being unsatisfied with his take from a drug robbery that Delgado-Rios had tipped Tejeda

and others about. Rather than cross-examining Rios on that point, Delgado-Rios attempted to impeach Rios by calling Agent Larissa Camacho, one of the case agents, to testify about an interview that she conducted with Rios. Camacho's report reflected that Rios had said that his brother, Miguel Rios, expressed dissatisfaction with his take from the robbery, and not that Rios mentioned Delgado-Rios was unsatisfied.

On cross-examination of Camacho, the prosecution elicited the fact that Rios had mentioned Delgado-Rios to Camacho in addition to Miguel Rios, although Camacho's report did not reflect that fact. Delgado-Rios objected that this fact was "already testified to by the witness, Rios."

Delgado-Rios now argues on appeal that Camacho's testimony about the interview of Rios was improper hearsay, that it erroneously allowed her to "impeach her own report," and that it introduced inadmissible opinion evidence about the veracity of Rios. These objections were not raised below, so we review for plain error. *Rollins*, 544 F.3d at 834.

Prior consistent statements that are offered to rebut a charge of recent fabrication or improper influence or motive are not hearsay. Fed. R. Evid. 801(d)(1)(B); *Tome v. United States*, 513 U.S. 150, 157-58 (1995). Such statements are admissible if they satisfy a four-part test: (1) the declarant testifies at trial and is subject to cross-examination; (2) his prior statement is indeed consistent with his trial testimony; (3) the statement is offered to rebut an explicit or implicit accusation of recent fabrica-

tion; and (4) the statement was made before the declarant had a motive to fabricate. *United States v. Ruiz*, 249 F.3d 643, 647 (7th Cir. 2001).

Rios's prior statement to Camacho satisfies the test. His statement was consistent with his trial testimony and was used to rebut Delgado-Rios's implied charge that Rios had fabricated his testimony. There is no indication that Delgado-Rios was prevented from recalling Rios for cross-examination about the assertions attributed to Rios by Camacho, and because those assertions meet the other requirements for admission under Rule 801(d)(1)(B), the district court did not commit plain error in allowing Camacho's statement.

### E. Whether the district court erred in allowing Delgado-Rios's mother-in-law to testify that he possessed cocaine.

Delgado-Rios next argues that the district court erred when it allowed prejudicial testimony from his mother-in-law, Metsi Thomas. Thomas testified to two incidents. Following Delgado-Rios's arrest, she found cocaine "in the battery compartment of an object." And Delgado-Rios once handed her a cellphone concealing cocaine. Both incidents occurred during the charged conspiracy. The court did exclude testimony that the "object" in the first incident was a child's toy, but the court permitted Thomas to testify that Delgado-Rios did not have a regular job and that he tricked agents who failed to locate cocaine hidden in the battery compartments of the cellphone and the object. Delgado-Rios objected to testimony related to the first incident, but not to the second, so

we review admission of testimony on the first incident for abuse of discretion, and admission of testimony on the second for plain error.

Thomas's testimony, which focused only on incidents that occurred during the conspiracy, was relevant to prove Delgado-Rios's participation in the conspiracy. The testimony helped prove that Delgado-Rios had access to cocaine. There was separate evidence that Delgado-Rios was in contact with Tejeda to supply him with cocaine. Having addressed the possible prejudice from the fact that drugs were concealed in a toy on one occasion, the district court did not abuse its discretion or commit plain error by allowing testimony directly relevant to the conspiracy.

### F. Whether the prosecutor improperly vouched for witnesses or improperly referenced facts not presented to the jury.

Delgado-Rios next argues that the government improperly vouched for its witnesses and improperly referenced facts not presented to the jury.

First, he argues that it was improper for the prosecutor to elicit testimony from cooperating witnesses about their "need to give truthful testimony in order to maintain the benefits of the witness' plea bargain." We have concluded that the "prosecution is entitled to get into evidence the fact that [plea] deals are conditioned upon truthful testimony." *United States v. Thornton*, 197 F.3d 241, 251-52 (7th Cir. 1999). Two types of "vouching" are forbidden: a prosecutor may not express her personal belief in the truthfulness of a witness, and a prosecutor may not

imply that facts not before the jury lend a witness credibility. *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir. 1997). Neither type was committed here. We did caution in *Thornton* that "for more than a decade we have been warning prosecutors to 'avoid unnecessarily repetitive references to truthfulness if it wishes to introduce the agreements into evidence. . . .' [P]rosecutors should consider refraining from introducing the documents into evidence and rely instead on testimony summarizing the agreement." *Thornton*, 197 F.3d at 253 (quoting *United States v. Lewis*, 110 F.3d 417, 421 (7th Cir. 1997)). In this case, the government did not even introduce the plea agreements themselves. It merely elicited testimony, which does not constitute error.

Delgado-Rios argues that the government improperly vouched for its cooperating witnesses when it referenced the plea deal conditions in its closing argument to the jury. The prosecutor stated:

> More important, these witnesses told you that if they lied, they jeopardized the deal that they had with the government. And where they did lie, where they have told inconsistent statements, they have admitted it to you. So you have all of these tools available to you to evaluate their testimony, the fact that they're corroborated, the fact that they have no motivation to lie, and the fact that they have been honest as they came into this courtroom. They did their best, and they tried to tell the truth.

The comments made here focus on the incentives provided by defendant's plea agreement for him to tell the truth. They resemble a similar argument about a plea

agreement that we accepted in *Renteria*. There, we concluded that "the prosecutor was free to invite the jury to draw a particular inference from [the plea agreement]. Defense counsel was free to urge a competing inference, as he did on numerous occasions. By arguing as they did, both sides respected the jury's ability to evaluate credibility based on the facts in evidence." *Renteria*, 106 F.3d at 766-67 (internal citations omitted). The prosecutor here did not express a "personal belief," and we conclude that the prosecutor's statement was not improper vouching.

Delgado-Rios also argues that the prosecutor implied that facts not before the jury lent a witness credibility. First, he cites the prosecution's argument that Delgado-Rios was guilty of the conspiracy based on wiretapped calls: "You also know that he was in the conspiracy first from the phone calls, 20 phone calls from the wiretap, 916, 930, 932, 938, and so on. . . . These are only some of the calls among the calls that were recorded in which Saul Tejeda and Apolinar Delgado-Rios discuss cocaine trafficking." The prosecution later clarified that it was referring the jury to consider only "the phone calls that were played in court." The government argues that its references to additional phone calls did not include an improper reference to evidence outside the record; it was an inartful way of saying that calls 916, 930, 932, and 938 were "only some of the calls among the calls that were recorded." We "must not lightly assume that 'a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" *United States*

*v. Rose*, 12 F.3d 1414, 1424 (7th Cir. 1994) (quoting *Boyde v. California*, 494 U.S. 370, 385 (1990)). We cannot conclude that this statement about phone calls constituted improper vouching.

Finally, Delgado-Rios argues that another remark made by the government in closing was improper vouching: "You heard then from only four customers of this conspiracy. As with the phone calls, we didn't present you with 100 percent of the evidence, because we would still be listening to testimony from cooperating witnesses." The government concedes that this statement was improper because it refers to evidence not presented to the jury as supporting conviction. With this concession, we examine the record as a whole to decide whether Delgado-Rios was prejudiced by the prosecutor's inappropriate remark so that his trial was fundamentally unfair. Our inquiry into the prejudice is informed by several factors, including: "(1) the nature and seriousness of the prosecutorial misconduct, (2) whether the prosecutor's statements were invited by impermissible conduct by defense counsel, (3) whether the trial court instructed the jury to disregard the statements, (4) whether the defense was able to counter the improper arguments through rebuttal, and (5) the weight of the evidence against the defendant." *United States v. Pirovolos*, 844 F.2d 415, 426 (7th Cir. 1988) (reciting the factors outlined in *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986)).

The improper remark made by the government was serious and the district court did not issue instructions to the jury to disregard the statement. However, defense counsel had an opportunity to refute the prosecution's

comment in its own closing argument and the prosecution did not reference that statement again in its rebuttal. More importantly, the overwhelming evidence of Delgado-Rios's guilt "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury." *United States v. White*, 222 F.3d 363, 371 (7th Cir. 2000) (quoting *United States v. Young*, 470 U.S. 1, 19 (1985)). We conclude that the government's improper remark did not render Delgado-Rios's trial fundamentally unfair.

### G. Whether the district court properly allowed testimony that Tejeda was a felon.

Tejeda argues that the district court erred in allowing evidence that he was a convicted felon. His attorney objected, and we review for abuse of discretion.

Sergeant Johnson testified that on October 12, 2004, he participated in a search of a house Tejeda shared with his girlfriend, Adrianne Potochney. Tejeda was not home. Authorities recovered a box of ammunition. On cross-examination, defense counsel asked:

Q:  It's not illegal to keep ammunition in the house, is it?

A:  It is in certain circumstances, yes.

Q:  Is there a law in Aurora that it's illegal to keep ammunition in a house?

A:  There is a state law that forbids possession of firearms and ammunition by felons.

Q:  Is Adrianne Potochney, is she a felon?

A:  Not that I'm aware of.

On redirect, the government asked:

Q:  You were asked if Adrianne Potochney was a convicted felon?

A:  Yes, I was.

Q:  Is there anyone else who lived in the residence at 1000 Superior Street who was a convicted felon?

DEFENSE COUNSEL MR. NEELY:  Objection, Your Honor.

A.U.S.A.:   Judge, I do believe that Mr. Neely opened the door.

Mr. NEELY:  I don't think that I did.

THE COURT:  Overruled.

A:  I believe Saul Tejeda was a felon.

The government argues on appeal that defense counsel did open the door, justifying the district court's decision to admit the testimony at issue. The defense argues the decision was improper.

In *United States v. Draiman*, we wrote that "opening the door" is a risk that a defense counsel assumes "when a calculated effort is made to tiptoe over thin ice to gain some evidentiary advantage. It also can be a delicate situation for the trial court's exercise of discretion so as not to permit undue prejudice to the defendant merely to correct some possible jury impression that may be of no lasting consequence." We continued: "The govern-

ment . . . does not have to turn the other cheek when it has the explanation to defense-created misimpressions. The trial court needs to use its seasoned trial experience in a common sense, realistic consideration of the problem." 784 F.2d 248, 255 (7th Cir. 1986).

Here, Tejeda argues that the cross-examination highlighted "the fact that Tejeda's girlfriend was in possession of the premises at the time of the search" and that the search did not result in her arrest. According to Tejeda, he was "not attempting to place some innocent gloss on Tejeda's possession of ammunition." If he wanted to focus on the girlfriend, however, Tejeda would not have asked about the legality of possession of ammunition. By doing so, Tejeda opened the door somewhat, and the government sought to clear up the defense-created misimpression. The district court exercised its discretion and admitted the testimony. The government did not dwell on the answer, either by attempting to go into details about Tejeda's prior conviction or by arguing the conviction in its closing argument. We cannot conclude that the trial judge abused his discretion.

### H. Whether the district court properly refused to bifurcate the trial into guilt and drug quantity phases.

On the penultimate day of trial, Melero moved to bifurcate the guilt and drug quantity phases, arguing that otherwise he would have to simultaneously argue that he was not a member of a drug conspiracy as charged but, that if he was, "he was not involved in the quantities of

drugs charged by the Government." The district court denied the motion, stating, "I don't see the prejudice frankly." Melero argues on appeal that the court violated his Fifth and Sixth Amendment rights and otherwise abused its discretion by failing to bifurcate the issues of guilt and drug quantity. A trial court has discretion to decide whether to bifurcate a trial, and we evaluate denial of a motion to bifurcate for abuse of discretion. *See Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000).

As the district court recognized here, it's not clear that Melero's arguments were even inconsistent: to argue that he was not a member of the conspiracy did not amount to conceding drug quantity, nor did arguing the drug quantity require an admission of guilt on the conspiracy. The court did not abuse its discretion in denying Melero's motion.

## I.   Whether the district court properly admitted a co-conspirator statement by Alviar that he and Melero were enforcers in the Latin Kings.

Cooperating witness Olivares testified that he had been a Latin King in Aurora who was imprisoned until August 2003. On being released from prison, Olivares began cooperating with the FBI. On March 25, 2004, Olivares recorded a conversation with Alviar in which Alviar stated: "Me and Pep Dog [Melero] got those spots. He's the enforcer, I'm hood enforcer." Olivares described those enforcer positions as high positions.

The defense objected to the recording on the ground that Alviar's statements to Olivares were not made in furtherance of the conspiracy and were admissible only against Alviar. The district court admitted the recording. Melero appeals. He argues that the court abused its discretion by permitting conversations with a confidential informant for the government into evidence under 28 U.S.C. § 801(d)(2)(E).

In conspiracy cases statements that are "part of the information flow between conspirators intended to help each perform his role" satisfy the "in furtherance" requirement of Rule 801(d)(2)(e). *Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir. 1989) (quoting *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988)). Such statements include those made to alert members to the progress of the conspiracy and their roles in it. *See United States v. Hunt*, 272 F.3d 488, 495-96 (7th Cir. 2001). The district court had ample grounds to conclude that Alviar's statement to Olivares furthered the conspiracy.

**J.   Whether the district court clearly erred in attributing more than 150 kilograms of cocaine to Tejeda for sentencing purposes and in assessing him an enhancement for being a leader or organizer of extensive criminal activity.**

Tejeda was sentenced at a base offense level of 38 based on a finding that the cocaine involved in the conspiracy and chargeable to Tejeda totaled 171.6 kilograms. Among other enhancements, the district court enhanced Tejeda's offense level by four points pursuant to U.S.S.G. § 3B1.1(b)

based on a finding that he was an organizer or leader of criminal activity involving five or more participants. Tejeda argues on appeal that he is entitled to resentencing because the court erred in its drug quantity calculations and in enhancing his offense level based on its finding that he was an organizer or leader. We review a court's factual findings at sentencing for clear error. *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005).

In terms of drug quantity, the government relied on testimony of cooperating witness Lopez to make its calculations. Lopez testified that from approximately January to September 2000, Tejeda dealt between one-quarter and one-half ounce of cocaine per week. The mid-point of this range is 10.5 grams, and 10.5 grams times 39 weeks amounts to 409.5 grams. From approximately October 2000 to December 2001, Lopez testified, Tejeda dealt approximately 1/8 kilo per week, and 126 grams times 65 weeks amounts to 8,190 grams. From approximately January to June 2002, Tejeda dealt approximately 1/4 kilo per week, and 250 grams times 22 weeks amounts to 5,500 grams. And from approximately July 2002 to March 2005, Tejeda dealt one to two kilograms per week, and one kilogram times 142 weeks amounts to 142,000 grams. Tejeda, Madrigal, Melero, and Delgado-Rios also stole some 4 kilograms, and defendants Tejeda, Alviar, and Heriverto Rios attempted to purchase 10 kilograms of cocaine as part of the conspiracy.

The district court stated:

[T]hese were not kilogram transactions. They were small, relatively small transactions. . . . But it's still

enough to max out on the threshold of the 38 offense level under the guidelines. . . . [T]hey were small quantity transactions, but they occurred over an awfully long period of time, and that's how it adds up, just so the record is clear about that.

We analyze the district court's finding for clear error. The court was "entitled to estimate drug quantity using testimony about the frequency of dealing and the amount dealt over a specified period of time." *United States v. Hernandez*, 544 F.3d 743, 746 (7th Cir. 2008) (quoting *United States v. Noble*, 246 F.3d 946, 952 (7th Cir. 2001)). While a defendant must be sentenced on the basis of reliable information, *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008), and a court may not base its calculation on pure speculation, *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998), the court may use a reasonable estimate of the drug quantities. *United States v. Krasinski*, 545 F.3d 546, 552 (7th Cir. 2008). The court's finding that Tejeda was responsible for more than 150 kilograms of cocaine was supported by the evidence, and there was no clear error.

Tejeda also advances an argument based on the leadership enhancement. In arguing for a leader or organizer role adjustment, the government pointed to Lopez's asserted role as subservient to Tejeda (packaging and transporting cocaine for Tejeda, transporting Tejeda for drug deals, storing cash, cocaine, and guns for Tejeda); Tejeda's recruitment of Samaniego to purchase a motorcycle in order to launder drug proceeds; Tejeda's claimed recruitment of Alviar and Rios in the attempt to pur-

chase 10 kilograms of cocaine; and Tejeda's calls to Melero and Madrigal when his home was fired upon. The defense argued that the conspiracy was a disorganized conspiracy without leadership.

The district court found that "the enhancement itself is based on relative culpability. And relatively speaking, I heard more than enough evidence to convince me that he was a leader of the people that he was dealing with, at least some of them, and that there were five or more people in the conspiracy." The court enhanced the offense level four points based on § 3B1.1(b), which provides, "If a defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."

On appeal, Tejeda does not dispute that there were five or more participants, but he points out that § 3B1.1(b) includes three categories: organizer or leader of criminal activity involving five or more participants (4 points); manager or supervisor of criminal activity involving five or more participants (3 points); or organizer, leader, manager, or supervisor of lesser criminal activity (2 points). He continues that for the four point enhancement, the government had to show the defendant had real and direct influence over other participants. He argues that the government did not demonstrate real influence.

Note 4 to § 3B1.1(b) lists factors to be considered in assessing the aggravating role adjustment, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." No factor listed in the application note is essential to finding the enhancement, nor must we give equal weight to each factor. *United States v. Wasz*, 450 F.3d 720, 729 (7th Cir. 2006). "[A]lthough the nature and purposes of the enhancement certainly require the defendant to have played a leading role in the offense, he need not literally have been the boss of his cohorts in order to qualify for the enhancement, for a leader can influence others through indirect as well as direct means." *Id.* at 729-30.

In this case, there was evidence showing that Lopez worked for Tejeda and that Tejeda oversaw Lopez in selling cocaine. There was evidence that Tejeda recruited Manny Samaniego (Cruz Samaniego's brother) to launder drug proceeds and purchase a motorcycle. Tejeda also recruited Alviar and Rios to join him in the attempted robbery of 10 kilograms. Tejeda used Melero as a lookout. Based on this evidence, there was no clear error in the district court's decision to enhance the offense level four points based on leadership.

### K. Whether the district court improperly sentenced Madrigal.

Finally, Madrigal contends that the district court improperly sentenced him based on drug quantities in excess of those reflected in the jury's verdict.

The jury verdict found Madrigal responsible for more than 500 grams but less than five kilograms of cocaine. At sentencing, the district court, while recognizing its authority to sentence based on amounts in excess of the jury's verdict, refused to find Madrigal responsible for any amount beyond the five kilograms found by the jury ("In this case . . . I feel constrained to honor the jury's finding"). The court found Madrigal responsible for between three-and-a-half and five kilograms of cocaine, which together with a firearms enhancement, brought Madrigal to level 32, category VI. The guideline range was 210 to 262 months. Madrigal received 240 months. The court sentenced based on quantities within the range found by the jury, which was proper.

### III. Conclusion

We AFFIRM the district court on all counts.