In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1974

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FERNANDO KING,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cr-00904-1—**David H. Coar**, *Judge.*

ARGUED SEPTEMBER 9, 2010—DECIDED DECEMBER 3, 2010

Before WOOD, EVANS, and TINDER, *Circuit Judges.*

EVANS, *Circuit Judge.* Fernando King, a high-ranking member (his title was "Supreme Inca") of the Latin Kings street gang, was charged with conspiracy to possess with intent to distribute in excess of five kilograms of cocaine (count one) and attempted possession with intent to distribute 500 grams or more of cocaine (count two), in violation of 21 U.S.C. § 846. The government's theory of the case was that King and

Augustin Zambrano, an even higher-ranking member (a "Corona") of the Latin Kings, agreed to accept money and drugs from a lower-ranking Latin King who wanted "protection" for his cocaine business. The fly in the ointment was that the Latin King seeking protection, Jesse Guajardo, was secretly working as an informant for the government. After a week-long trial, a jury convicted King on both counts. He was subsequently sentenced to a term of 240 months.

King appeals, challenging several of the district judge's rulings along the way. Specifically, he argues that the judge erred in denying his motion to suppress a "sham kilogram of cocaine" seized from King and Zambrano's restaurant the day after Guajardo delivered it to King. King also challenges the judge's decision to admit gang-related evidence, his refusal to give a jury instruction on entrapment, and his failure to follow up on a jury note that expressed safety concerns. Lastly, King contends that the evidence was insufficient to support his conspiracy conviction.

In October 2006, Guajardo—who agreed to cooperate with the Bureau of Alcohol, Tobacco, and Firearms (ATF) after being arrested for drug trafficking—had a conversation with King during which Guajardo suggested a "business proposition." Guajardo told King that he (Guajardo) wanted "security . . . [l]ike a little insurance policy," meaning protection from the Latin Kings for his distribution of cocaine to prevent him from being robbed or burned by any other member of the gang. King responded that he would "talk to Carnel tomorrow. . . . So

somewhere down the line if I'm doing something and he don't feel like he's left out. . . . And he feels like he didn't know nothing, you know. He don't like that." According to Guajardo, "Carnel" meant Zambrano, also known as "Viejo." When Guajardo proposed that he talk to Zambrano himself, King replied, "Yeah, no, we don't do it that way. I'll sit down with the Viejo and I'll get back with you."

In November, Guajardo had another conversation with King about the insurance arrangement. Guajardo reminded King that he was going to "talk to the Viejo" first. The men then discussed the issue of payment, and King said that Zambrano wanted it "up front." (According to King, Zambrano was having financial problems and was unable to raise money from his "immigration" business—that is, the selling of fake identification cards to illegal aliens.) King asked for "one off the top for me and the Viejo," meaning a kilo of cocaine. When Guajardo sought to clarify whether he should pay with money or drugs, King replied that it did not matter, but if Guajardo paid with cocaine, King "give[s] it to somebody and they move that shit." King then promised, "I'm going to put my word behind it and the Viejo supports me you know what I'm saying. Anything I'm going to agree to the Viejo going to be right with it, you know." King also told Guajardo that another Latin King, Danny Aguilar, also known as "Biggies," had the same sort of drug-trafficking protection arrangement that Guajardo was seeking.

A few days later, Guajardo told King that he had received 10 kilos of cocaine and would be receiving more

soon. Regarding the insurance on the 10 kilos, King said, "I told you what we [Zambrano and King] want," which was a kilo of cocaine up front. Guajardo responded that he would lose money on that deal and proposed a $500 payment per kilo of cocaine. King said that, if he received cocaine from Guajardo, he would "sell it real quick for me and Carnal [*sic*]." More specifically, he would have one of his "boys" sell the cocaine on King's behalf. Three days after that, Guajardo paid King $2,000 (it was supposed to be $5,000, but the ATF only gave Guajardo $2,000) and promised that he would make an additional payment of a kilo of cocaine soon, which would cover the insurance on the kilos of cocaine that he was about to receive.

On December 4, Guajardo went to a taqueria (a small taco restaurant) owned by King and Zambrano to deliver the kilo of cocaine, which, unbeknownst to King, was a sham. King and Zambrano were both present, but Zambrano was in a different part of the restaurant when the exchange took place. Upon receiving the kilo from Guajardo, King hid it in piping above a refrigerator in the back of the restaurant. Guajardo then had a conversation with Zambrano about Aguilar, who, to repeat, also had an insurance arrangement with King and Zambrano. Guajardo was concerned because he was late on a payment to Aguilar for cocaine and did not want to pay any "taxes." Zambrano replied that he had called "Biggies" and told him to call Guajardo. King offered to take the money on Aguilar's behalf, but Guajardo did not have it with him.

The next day, King was arrested. Pursuant to a search warrant, officers recovered gang literature, a Latin King constitution and manifesto, and other gang-related materials from his home. According to the constitution, a "Corona" is the highest-ranking officer of the Latin King nation. Guajardo identified Zambrano as one of the three "Coronas" (he was the only one not in prison) and King as the "Supreme Inca," a position created by Zambrano. The constitution forbids the sale of heroin but not cocaine. It also prohibits one gang member from accumulating debt to another member and provides procedures for settling grievances between members.

That same day, at about 9:00 a.m., ATF agent Ron Zitek and two Chicago police officers arrived at the taqueria, which was not scheduled to open for business until 11:00 a.m. The men wore plainclothes, bulletproof vests, and badges. After about 45 minutes, a cook named Antonio Cabrera-Lopez arrived and opened the door. The officers followed him inside. An alarm was activated, and Cabrera-Lopez used a code to disable it. Zitek then attempted to talk to Cabrera-Lopez but discovered that he could not speak English very well. So Zitek summoned a Spanish-speaking agent, Carl Jorgensen. While they waited for Jorgensen, the officers stayed in the front customer area of the restaurant.

Jorgensen and another Chicago police officer arrived and spoke to Cabrera-Lopez. According to Jorgensen, Cabrera-Lopez said that he was not the owner, just the cook, but he orally consented to a search of the premises.

He did not want to sign a consent form, however, because it was written in English. (Cabrera-Lopez's testimony was conflicting: on cross-examination, he said that he consented but later reversed himself.) Agent Zitek then searched the restaurant and recovered the sham kilo of cocaine in the spot where King had hidden it. At no time did Cabrera-Lopez tell the agents to stop their search or to leave. According to Cabrera-Lopez, the encounter was "polite."

Shortly after his indictment,[1] King brought a motion to suppress the sham kilo seized from the taqueria. The district judge framed the issues as whether Cabrera-Lopez had authority to consent to the search and whether his consent was voluntary. Regarding the first issue, the judge found that, because King gave Cabrera-Lopez the keys to the restaurant and full control over the premises (including the code to deactivate the alarm), King assumed the risk that Cabrera-Lopez might permit others to enter while King was absent. Regarding the second issue, the judge found that Cabrera-Lopez's age and employment responsibility suggested that he could understand the situation, and that there was no evidence of coercion. The judge also specifically found that Cabrera-Lopez consented to the search. Concluding that Cabrera-Lopez had apparent authority and gave vol-

---

[1] A grand jury originally indicted King on one count of attempted possession with intent to distribute. Several months later (after King's motion to suppress was denied), a grand jury returned a two-count superseding indictment, which added the conspiracy charge.

untary consent, the judge denied King's motion to suppress.

Before and during the trial, King objected to the introduction of gang-related evidence. While the district judge imposed some limitations,[2] he ultimately admitted most of the evidence, finding that it was central to the government's theory that King and Zambrano, as leaders of the Latin Kings, could and did insure that the gang provided protection for Guajardo's drug trafficking. In particular, the judge admitted recordings and transcripts regarding: (1) the May 28, 2006, "violation" at Frankie & Johnny's bar, where King ordered a lower-ranking Latin King to be beaten because he threw a beer at Zambrano's wife; (2) the June 1, 2006, "Crown Town" meeting, where King rebuked several Latin King officers who disobeyed his order to have the individual who threw the beer stripped of his position in the gang; and (3) the November 21, 2006, conversation, where King explained to Guajardo that Zambrano was unable to raise funds from his "immigration" business.

At the close of trial, the district judge denied King's request for a jury instruction on the issue of entrapment, concluding that King had not shown a lack of predisposition. The judge also declined to conduct an inquiry re-

---

[2] The judge suggested a stipulation concerning a Latin Kings scrapbook, which was entered. He also limited the government's questioning on some parts of the Latin Kings constitution and only admitted the first few pages of the transcript from the June 1, 2006, "Crown Town" meeting.

garding a note from the jury, finding nothing to suggest an extraneous influence. The note stated in its entirety, "We have reached a verdict. There are several jury members that have concerns regarding personal safety and security." Lastly, the judge denied King's motion for a mistrial, affirming his rulings regarding the motion to suppress, the introduction of gang-related evidence, the entrapment instruction, and the jury note.

The first issue is whether the district judge properly denied King's motion to suppress. When considering a motion to suppress, we usually review legal questions *de novo* and findings of fact and credibility determinations for clear error. *United States v. Wesela*, 223 F.3d 656, 660 (7th Cir. 2000). A factual finding is clearly erroneous if we are "left with the definite and firm conviction that a mistake has been made." *United States v. Gravens*, 129 F.3d 974, 978 (7th Cir. 1997). If a party raises new arguments for suppression on appeal, however, "we review for plain error if the defendant can show good cause for failing to make those arguments in the district court." *United States v. Figueroa*, 622 F.3d 739, 742 (7th Cir. 2010).

Here, King's primary complaint—that the officers' initial entry into the taqueria was illegal—was not developed in the district court. To repeat, the issues there were whether Cabrera-Lopez had apparent authority to consent to the search and whether his consent was voluntary. King has not established good cause for his failure to present the illegal entry argument previously. And even if he passed that threshold, King has not shown error, much less plain error, in the district judge's decision.

The officers entered the restaurant with Cabrera-Lopez after he unlocked the door and disabled the alarm. They then waited in the front customer area until he consented to the search. We disagree with King that, simply because the restaurant was not "open for business," any entry was automatically illegal. As the government pointed out at oral argument, a customer could conceivably enter in a similar matter—that is, through an unlocked door but before service hours began—to place a special order. Furthermore, Cabrera-Lopez never objected to the officers' entry, and the fact that they never expressly asked permission to enter is not dispositive. *See United States v. Lewis*, 608 F.3d 996, 999-1000 (7th Cir. 2010) (citing cases and finding consent despite the lack of an explicit, verbal exchange between the police and the defendant).

King does not fare any better with the arguments that he did raise in the district court. "A warrantless search does not violate the Fourth Amendment if a person possessing, or reasonably believed to possess, authority over the premises voluntarily consents to the search." *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008). Apparent authority turns on whether the facts available to the officer at the time would allow a person of reasonable caution to believe that the consenting party had authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). The existence of voluntary consent is a question of fact to be determined based on the totality of the circumstances. *United States v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007).

The district judge concluded that Cabrera-Lopez had apparent authority to consent to the search. We agree. Cabrera-Lopez had keys to the restaurant and the code to deactivate the alarm. He also opened the restaurant alone, and it was a small establishment. Cabrera-Lopez's actions clearly justified the officers' belief that he had full control over the premises, including the authority to grant access to others. *See United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010) (stating that officers have a duty to inquire further as to a third party's authority only "when the circumstances make the authority questionable in the first place"). And the fact that the officers knew that Cabrera-Lopez was not the owner does not invalidate his authority. *See United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) ("The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes.").

The district judge also found that Cabrera-Lopez voluntarily consented to the search. Again, we agree. At no time did Cabrera-Lopez tell the agents to stop their search or to leave. He testified that the encounter was "polite," and there is absolutely no evidence of coercion. Although Cabrera-Lopez stated (at one point) that he did not give permission for the search, we discern no error in the district judge's decision to credit the agent's testimony that Cabrera-Lopez consented orally but did not sign a consent form because it was written

only in English. The district judge did not err when he denied King's motion to suppress.[3]

The next issue is whether the district judge erred in admitting gang-related evidence under Federal Rules of Evidence 403 and 404.[4] We review the admission of evidence for an abuse of discretion. *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010). A reversal is appropriate only when the record contains no evidence on which the district judge rationally could have based his ruling. *Id.*

A defendant's prior bad acts are inadmissible as evidence to show his propensity to commit the charged crime. Fed. R. Evid. 404(b). The evidence may be admitted, however, for non-propensity purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." *Id*. If the "bad acts" are really direct evidence of the crime charged, Rule 404(b) is inapplicable. *United States v. Lane*, 323 F.3d 568, 579 (7th Cir. 2003). Even evidence introduced for legitimate purposes is inadmissible if it fails to meet

---

[3]  King would have had an uphill battle even if the district judge had improperly denied his motion to suppress. King was captured on audio and video tape receiving what Guajardo testified to be a sham kilo of cocaine after several recorded conversations about the transaction.

[4]  In his appellate brief, King separates this issue into two arguments, one regarding gang-related evidence in general and the other regarding three specific pieces of evidence. But the discussions largely overlap, so we will treat them together.

the requirements of Rule 403. *United States v. Ciesiolka*, 614 F.3d 347, 355 (7th Cir. 2010). That rule mandates exclusion if, among other things, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

Gang-related evidence can be especially troublesome. Because "gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior . . . [g]uilt by association is a genuine concern whenever gang evidence is admitted." *United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004). But "[w]e have consistently held that, under appropriate circumstances, gang evidence has probative value warranting its admission over claims of prejudice." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996); *see also Montgomery*, 390 F.3d at 1018 (collecting cases). In particular, gang-related evidence may be admitted "to demonstrate the existence of a joint venture or conspiracy and a relationship among its members." *United States v. Westbook*, 125 F.3d 996, 1007 (7th Cir. 1997); *see also United States v. Alviar*, 573 F.3d 526, 537-38 (7th Cir. 2009) (approving the admission of gang-related evidence to prove conspiracy allegations).

Here, although a large amount of gang-related evidence was admitted, there was a strong link between it and the crimes charged. The probative value of the evidence was high, as it helped establish the relationship among King, Zambrano, and Guajardo, the rank of those men within the gang, and King's criminal intent. More specifically, it was central to the government's theory

that King and Zambrano, as leaders of the Latin Kings, could and did insure that the gang provided protection to Guajardo's drug trafficking operation, which they exchanged for drugs and money. Furthermore (and as we discuss later in more detail), without establishing King and Zambrano's positions in the gang and relationship to each other, King's incriminating statements regarding Zambrano's involvement in the conspiracy may have looked like a lot of hot air.

King focuses our attention on three specific instances referred to at trial: (1) the May 28, 2006, "violation" at Frankie & Johnny's bar; (2) the June 1, 2006, "Crown Town" meeting; and (3) the November 21, 2006, conversation concerning the immigration (the "mica") business.[5] The May 28 violation, where King ordered a lower-ranking Latin King to be beaten for throwing a beer at Zambrano's wife, helped corroborate Guajardo's testimony that King was a high-ranking member of the gang, had a close relationship with Zambrano, and could deliver on his promise to provide protection for Guajardo. Similarly, the June 1 meeting (the evidence of which was limited by the district judge), where King rebuked several Latin King officers who disobeyed his order to punish the member who threw the beer, demonstrated King's rank

---

[5] The government contends that King forfeited his argument that this evidence was improperly admitted under Rule 404(b). Although the government's contention has merit, *see Alviar*, 573 F.3d at 538, we need not decide this question because we find no error in the admission of the evidence.

within the gang and his ability to follow through on his promise to Guajardo.

The November 21 conversation is a little different. There, King explained to Guajardo that Zambrano had financial problems and was unable to raise funds from his "immigration" business. We agree with King that the subject of illegal aliens, especially when combined with gang activity, is a sensitive one. But King's comments came in the context of his conversation with Guajardo about the insurance payment. More specifically, King was providing justification for Zambrano's requirement that the payment be made up front. The evidence therefore helped explain the manner of Guajardo's subsequent payments and King and Zambrano's financial motive to commit the crime. Although there was some other evidence on this point, the record does not indicate that it was overkill. Because the disputed evidence concerned the crimes charged and was not unduly prejudicial considering its high probative value, we conclude that the district judge did not abuse his discretion in admitting it.

The next two issues can be disposed of quickly. The first is whether the district judge erred in refusing to instruct the jury on entrapment. This is a legal question, which we review *de novo*. *United States v. Millet*, 510 F.3d 668, 675 (7th Cir. 2007). When claiming entrapment, a defendant must establish: (1) lack of predisposition to engage in criminal conduct; and (2) government inducement of the crime. *Id.* Typically, all of the action is on the first element. When analyzing predisposition, we

consider several factors, the most important of which is "whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement." *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999).

King argues that he was not predisposed to commit the crimes because he never sold drugs on a prior occasion. This is an insufficient showing of reluctance. Moreover, the evidence established that, while it was Guajardo who first floated the insurance idea to King, it was King who then discussed the proposition with Zambrano and initiated negotiations with Guajardo. The record does not indicate any unwillingness on King's part to provide protection for Guajardo or to accept cocaine as payment. *See United States v. Orr*, 622 F.3d 864, 870 (7th Cir. 2010) (finding that "the ready commission of the criminal act amply demonstrates the defendant's predisposition") (citation and emphasis omitted). The district judge properly rejected an instruction on entrapment.

The next issue is whether the district judge properly denied King's motion for a new trial without questioning the jurors about their note. We review this decision for an abuse of discretion. *See United States v. Kizeart*, 102 F.3d 320, 326 (7th Cir. 1996); *United States v. Sanders*, 962 F.2d 660, 673 (7th Cir. 1992). A judge's duty to investigate "arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994) (citation and emphasis omitted). In other words, "[a] defendant's

mere allegations of taint or his unsubstantiated suspicions do not necessitate inquiry by the court." *Id.* (emphasis omitted).

Here, King simply points to the jury note itself, which stated only that some jurors "ha[d] concerns regarding personal safety and security." Nothing in the note suggested exposure to outside influences. *See Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007) (finding that a juror's "own subjective fear" was not extrinsic to the trial); *United States v. Thornton*, 1 F.3d 149, 155-56 (3d Cir. 1993) (finding that jurors' "general apprehensiveness about their safety" did not indicate extraneous influences). Rather, as King argued in the district court, the jurors' fears likely originated from the invocation of his membership with the Latin Kings. As this evidence was part of and *intrinsic* to the trial, there was no cause for inquiry with the jurors. The district judge properly denied King's motion for a new trial.

The final issue for us is whether the evidence supported a conspiracy conviction. In challenging the sufficiency of the evidence, King faces a "nearly insurmountable hurdle." *United States v. Corson*, 579 F.3d 804, 809 (7th Cir. 2009). That is so because we "view *all* the evidence and draw *all* reasonable inferences in the light most favorable to the prosecution and uphold the verdict if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004) (citation omitted and emphasis added). We do not reweigh the evidence, second-guess the jury's credibility determina-

tions, or overturn a conviction because we would have
voted to acquit.

A conspiracy is "a knowing and intentional agreement
between two or more people to fulfill a particular
criminal objective." *United States v. Kincannon*, 567 F.3d
893, 897 (7th Cir. 2009). So here, the question is whether a
jury could reasonably infer that King and Zambrano[6]
agreed to cooperate to provide protection for Guajardo's
cocaine sales in exchange for money and drugs. As the
government concedes, the evidence of Zambrano's agree-
ment was indirect. But that is fine, as long as, when
viewed in the light most favorable to the government, the
evidence was sufficient to support a conviction. *See
United States v. Taylor*, 116 F.3d 269, 271 (7th Cir. 1997)
("[T]he government may establish that agreement, as it
may the other elements of the charge, through circum-
stantial evidence."); *see also United States v. Gilmer*, 534
F.3d 696, 703 (7th Cir. 2008) ("A conspiracy may be
shown by evidence which shows that the co-conspirators
embraced the criminal objective of the conspiracy, that
the conspiracy continued towards its common goal,
and that there were co-operative relationships.").

During his conversations with Guajardo, King repeatedly
referenced Zambrano and the need to confer with him.

---

[6]  In its appellate brief, the government also argues that Aguilar
was a member of the conspiracy. At oral argument, how-
ever, it became clear that Zambrano is the only potential co-
conspirator, with Aguilar being more of a customer of the
conspiracy. Guajardo, a cooperating witness, is also ineligible.
*See Corson*, 579 F.3d at 811.

When Guajardo initially proposed the insurance arrange-
ment, King responded that he needed to "talk to
Carnel" and "sit down with the Viejo" first. When
Guajardo and King met again, King asked for "one off
the top for me and the Viejo," meaning a kilo of cocaine
up front. King clarified that the payment could be in the
form of money or cocaine, but if Guajardo paid with
cocaine, "I give it to somebody and they move that shit."
King then promised that "[a]nything I'm going to agree
to the Viejo going to be right with it, you know." A few
days later, when Guajardo told King that he had received
his supply, King confirmed that he and Zambrano
wanted a kilo of cocaine up front to cover the insurance
costs. King said that he would "sell it real quick for me
and Carnal [*sic*]." After making an initial cash payment,
Guajardo later delivered a sham kilo to King while
Zambrano was present (although in a different part of
the restaurant). King's statements therefore support the
government's theory of the case, including the existence
of an agreement between King and Zambrano.

The gang-related evidence that we previously dis-
cussed helped establish that King's comments were not
mere boasting. Guajardo testified that Zambrano was a
"Corona" of the Latin Kings, that King was appointed
the "Supreme Inca" by Zambrano, and that together,
they were the two most powerful Latin Kings not in
prison. The constitution found at King's home stated
that a "Corona" is the highest-ranking officer of the Latin
King nation. The gang's rules forbid members from
accumulating debts. And King had punished lower-
ranking gang members for offending Zambrano and

disobeying orders. This evidence showed that King and Zambrano were leaders of the gang, that King worked closely with Zambrano, and that King could back up his promise to Guajardo that he and Zambrano would provide protection for Guajardo's drug trafficking consistent with gang rules—or so a jury could find. *See generally Alviar*, 573 F.3d at 537 (explaining the role of gang-related evidence in proving conspiracy allegations and finding that "[t]he fact that [the defendants] were bound together by their gang membership made it more likely that they participated in a conspiracy").

Furthermore, Guajardo had an important conversation with Zambrano himself. After he delivered the sham kilo to King, Guajardo spoke to Zambrano about Aguilar, who also had insurance protection through King and Zambrano. Guajardo expressed concern because he was late on a payment to Aguilar for cocaine and did not want to pay a penalty. Zambrano replied that he had called Aguilar and told him to call Guajardo. A jury could infer that, had Zambrano not been a part of the drug trafficking insurance conspiracy, he would not have been interested in or involved with Guajardo's debts to Aguilar.

King's primary argument is that there was no direct evidence that Zambrano and King had a "meeting of the minds"—that is, no recordings of Zambrano agreeing to the insurance arrangement. But, as King concedes and as we previously discussed, a conspiracy can be established by indirect evidence. *Taylor*, 116 F.3d at 271. Furthermore, the record explains why Guajardo never spoke to

Zambrano. When Guajardo suggested that he talk to Zambrano himself, King replied, "Yeah, no, we don't do it that way. I'll sit down with Viejo and I'll get back with you." Essentially, King is asking us to reweigh the evidence, which we cannot do. *Corson*, 579 F.3d at 812. King was entitled to argue to the jury that, due to the lack of direct evidence of Zambrano's agreement, they should reject the government's conspiracy theory. We cannot say that, when viewing all the evidence in the light most favorable to the government, there was no rational basis for the jury's decision to find King guilty on the conspiracy count.

For all these reasons, the judgment of the district court is AFFIRMED.