In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 24-1528

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTWAN EILAND,

*Defendant-Appellant.*

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 21 CR 297 — **Sharon Johnson Coleman**, *Judge.*

—————————

ARGUED NOVEMBER 3, 2025 — DECIDED DECEMBER 8, 2025

—————————

Before ST. EVE, JACKSON-AKIWUMI, and MALDONADO,
*Circuit Judges.*

ST. EVE, *Circuit Judge.* A jury convicted Antwan Eiland of
twice selling crack cocaine to a government informant. Eiland
appeals, contending that the evidence against him was insuf-
ficient, the prosecutor indirectly commented on his decision
not to testify, and a juror improperly drew a negative infer-
ence from his silence. We affirm.

## I. Background

In 2017, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through a confidential informant named Luis Villegas, conducted two controlled buys of crack cocaine from an individual who went by the nickname "Black." In May 2021, a grand jury returned an indictment against Eiland arising out of these sales, charging him with two counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1). Eiland went to trial, where his theory of defense was that he was not "Black." The jury concluded otherwise and convicted him on both counts.

### A. The Evidence at Trial

The evidence at trial centered around three events: Villegas and Eiland's initial meeting, and their two subsequent drug deals.

Villegas testified that on February 15, 2017, he overheard a man discussing prices for "hard," a slang term for crack cocaine, in the lobby of an Illinois courthouse. Villegas approached the man, who identified himself as "Black," and the two exchanged contact information to facilitate future drug deals. Upon leaving the courthouse, Villegas accidentally called "Black" before calling his handler, ATF Special Agent Mike Ramos, to provide him with the phone number Villegas had received. Special Agent Ramos, who also testified at trial, ran the number in a law enforcement database, which returned a hit for Antwan Eiland. Special Agent Ramos then sent Eiland's driver's license photograph to Villegas, who confirmed that Eiland was the man Villegas had met in the courthouse that morning. Villegas further identified Eiland in the courtroom during trial.

On cross-examination, Eiland challenged the timeline Villegas recounted. Villegas testified that he had been called to appear at the courthouse at 9:00 or 9:30 a.m. on the morning he met Eiland. He further testified that he accidentally called Eiland after leaving the courthouse. Phone records, however, showed that the call occurred at 8:59 a.m. As for Special Agent Ramos, cross-examination focused on the poor quality of his recordkeeping. His original report regarding Villegas and Eiland's meeting was somewhat sparse on details, and he did not save the printout from the law enforcement database in which he ran Eiland's phone number.

Over the two days following Eiland and Villegas's initial interaction, the two negotiated their first drug deal. Recorded text messages and phone calls showed an agreement to meet in a Popeye's parking lot on February 17, 2017. Villegas and Special Agent Ramos arrived first. Villegas testified that he observed a car with Eiland in the passenger seat stop about two parking spaces away; an unknown woman was driving the car. He and Eiland then exchanged the money for the drugs in the woman's car. Villegas, whom Special Agent Ramos had searched prior to the transaction, then returned to Special Agent Ramos's vehicle and relinquished the crack cocaine. While the jury saw audio-video footage of the transaction, Eiland's face was visible for only a split-second, and a shadow obscured his facial features. Special Agent Ramos corroborated this account. Because he had a "clear line of sight" to Eiland's car and had seen Eiland's driver's license photograph, Special Agent Ramos also identified Eiland in the courtroom.

Theresa Robinson drove Eiland to the Popeye's parking lot that day, and she also testified at trial. Robinson, a friend of

Eiland's aunt, identified Eiland in the courtroom and testified that she had heard Eiland go by the nickname "Black." She further explained that on February 17, 2017, she gave Eiland a ride to the Popeye's parking lot without knowledge of his intent. When they arrived, a man got into the backseat of her car and placed a scale on her armrest, at which point she understood a drug deal to be taking place. On cross-examination, Eiland elicited that ATF agents had not questioned Robinson about the incident until 2022, five years after it occurred, and that Robinson did not recall the incident until seeing a subpoena with Eiland's name on it. Eiland also brought out that when agents asked her for help in identifying "Black," Robinson said she knew several people who used that nickname but specifically identified only a man named Mike.

As recorded text messages and phone calls showed, Villegas and Eiland planned a second drug deal the next month. Villegas testified that on March 29, 2017, Special Agent Ramos drove him to a McDonald's. After Special Agent Ramos searched Villegas, Villegas met Eiland inside, and the two went into the bathroom to exchange the drugs and money. Upon returning to Special Agent Ramos's vehicle, Villegas turned over the drugs he had purchased from Eiland. As before, this deal's audio-video footage did not capture any clear shots of Eiland's face.

Eiland did not testify or otherwise put on a defense.

**B. Closing Arguments**

Eiland's closing argument focused in part on various types of evidence that were "missing" from the government's case. It was problematic, defense counsel argued, that the government did not produce the buy money, Eiland's cell phone,

location-tracking data from that cell phone, and more. Eiland noted the absence of this evidence was "very problematic" for the government's case. "If it linked to Antwan Eiland," the defense argued, "obviously you would have heard such evidence. But you didn't."

On rebuttal, which forms the basis of Eiland's Fifth Amendment challenge, the government explained that the defense would always be able to come up with some piece of evidence that was "missing." The prosecutor then stated: "So you focus on what's the—focus on the evidence that's before you. And that shows that he is guilty. And I get why Mr. Boyle [the defense attorney who delivered Eiland's closing argument] focused on what there wasn't, is because they don't have an answer for what there was." The prosecutor then listed the key evidence adduced at trial and explained that it established Eiland's guilt.

**C. Post-Trial Juror Remarks**

The jury convicted Eiland on all counts. After the jury read its guilty verdict, the district judge permitted jurors to speak with the trial attorneys. Approximately four jurors took the court up on its offer and spoke with the prosecution team. (The defense team decided against joining.) During this interaction, one of the jurors ("Juror A") speculated that Eiland may have worn a mask during the trial to prevent the jurors from comparing his face to the one they saw in the footage. Juror A added it was possible Eiland did not testify to prevent

the jurors from comparing his voice to that captured in the recordings played at trial.[1]

## D. Post-Trial Motions

After the jury convicted Eiland, he moved for acquittal (because of allegedly insufficient evidence) and a new trial (because of alleged juror bias) under Federal Rules of Criminal Procedure 29 and 33, respectively. The district court denied both motions.

### II. Discussion

We begin with Eiland's challenge to the sufficiency of the evidence. We then address, in turn, the prosecution's rebuttal argument and the allegation of juror bias.

## A. Sufficiency of the Evidence

We review the district court's denial of a motion for judgment of acquittal de novo. *United States v. Watkins*, 107 F.4th 607, 626 (7th Cir. 2024). As a practical matter, "the standard of review is that for sufficiency of the evidence." *Id.* (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)).

That standard imposes "a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). In determining whether the evidence was sufficient to convict, "we give great deference to the jury's verdict, viewing the trial evidence in the light most favorable to the verdict and drawing all reasonable inferences in the government's favor." *United States v. Coley*, 137 F.4th 874, 880 (7th Cir. 2025). We may overturn the jury's verdict only if, after

---

[1] We know of Juror A's comments because the prosecutors promptly notified defense counsel of them.

granting such deference, we conclude that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022) (quoting *United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020)).

The high bar for deeming evidence insufficient extends still higher where, as here, the defendant challenges the credibility of witnesses. Because "evaluating the credibility of the witnesses is the jury's job," *United States v. Cruse*, 805 F.3d 795, 812 (7th Cir. 2015), reviewing courts may not "reassess witness credibility," *Foy*, 50 F.4th at 624 (quoting *Medina*, 969 F.3d at 821). Indeed, the jury "is entitled to believe the testimony of even the most dishonest of witnesses." *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017). Accordingly, "[w]hen a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere, as the jury is the final arbiter on such questions." *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996).

This general rule has a limited exception—applicable "[o]nly in the narrowest of circumstances"—where a witness's testimony is "incredible as a matter of law." *Id.* at 189; *see United States v. Jones*, 56 F.4th 455, 488 (7th Cir. 2022). Such circumstances include when "it was 'physically impossible for the witness to observe what he described' or 'impossible under the laws of nature for those events to have occurred at all.'" *Jones*, 56 F.4th at 488 (quoting *Conley*, 875 F.3d at 400). Simply because a witness was impeached, however, does not render her testimony incredible as a matter of law. *See United States v. Contreras*, 820 F.3d 255, 264 (7th Cir. 2016). "Although a jury may certainly reject the testimony of a witness who was

impeached," a jury may also decide to accept some or all of her testimony, and we "will not disturb" that decision "unless the testimony is unbelievable on its face." *Alcantar*, 83 F.3d at 190.

To convict Eiland under 21 U.S.C. § 841(a)(1), the government had to prove beyond a reasonable doubt that (1) Eiland knowingly distributed a mixture and substance containing a detectable amount of cocaine base, and (2) Eiland knew the mixture and substance contained some kind of controlled substance. *See* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit, at 995 (2023 ed.); *United States v. Black*, 104 F.4th 996, 1001–02 (7th Cir. 2024). Eiland urges that there was insufficient evidence to conclude that he is "Black" and therefore insufficient evidence to convict. But his arguments simply ask us to reassess witness credibility—and thereby usurp the jury's role—so we must reject them.

Eiland first attacks Villegas's testimony as incredible as a matter of law due to the timeline inconsistency elicited on cross-examination. Because Villegas said he first called Eiland after his 9:00 or 9:30 a.m. court hearing but in fact called him at 8:59 a.m., Eiland insists that we must reject the entirety of Villegas's testimony as impossible under the laws of nature. But this inconsistency does not make it "impossible under the laws of nature" for Eiland and Villegas to have met at all or for Eiland to have twice sold drugs to Villegas. The jury is free to believe a witness where, as here, his testimony's inconsistencies "were arguably tangential ones that did not relate to the core events surrounding the crime." *United States v. Saunders*, 973 F.2d 1354, 1359 (7th Cir. 1992). If it were otherwise, appellate courts would frequently "second-guess the jury's credibility determinations," *United States v. Mbaye*, 827 F.3d

617, 620 (7th Cir. 2016), reducing to mere lip service our general rule of according those judgments conclusive weight. Moreover, the jury had evidence to corroborate Villegas and Eiland's February 15 courthouse meeting. Court records showed that Eiland had a hearing that morning, and Villegas, who had received a traffic ticket two days earlier, testified that he also had a hearing that morning. The jury was therefore permitted to credit Villegas's testimony.

Eiland's other arguments also do not satisfy the "physically impossible" or "impossible under the laws of nature" limited exceptions. Based on Special Agent Ramos's record-keeping, Eiland attacks the strength of the link between him and the phone number with which Villegas coordinated the drug deals. He also challenges Special Agent Ramos's courtroom identification because Special Agent Ramos had never met Eiland, only knew his face from Eiland's driver's license photograph, and was about twenty feet away from Eiland's car during the February 17 drug deal. Finally, he contests Robinson's identification because she did not recall the drug deal until seeing Eiland's name on a subpoena.

These arguments require that we reweigh evidence and reassess witness credibility. Indeed, Eiland brought out on cross-examination each of the weaknesses that he emphasizes on appeal, and his closing argument underscored these points, but the jury rejected them. Eiland thus seeks to convert testimony that has been compromised into testimony that is incredible as a matter of law, but he does not explain how any of these witnesses' shortcomings make their accounts impossible to believe. Because it is the "exclusive function of the jury to determine the credibility of witnesses," we have no basis to interfere. *Watkins*, 107 F.4th at 626 (quoting *United States v.*

*Godinez*, 7 F.4th 628, 638 (7th Cir. 2021)). Between the three lead witnesses' testimony, the recorded text messages and phone calls, and the audio-video footage, we cannot say no rational trier of fact could have found Eiland guilty beyond a reasonable doubt.

## B. Rebuttal Argument

Eiland next argues that the prosecutor's rebuttal argument violated his Fifth Amendment right against self-incrimination. Because Eiland concededly did not object below, our review is for plain error. To prevail under that standard, Eiland must show there is (1) an error that (2) is plain (i.e., clear or obvious); (3) affected his substantial rights, "which generally means that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different"; and (4) "had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *United States v. Page*, 123 F.4th 851, 864, 867–68 (7th Cir. 2024) (en banc) (cleaned up).

The Fifth Amendment guarantees that "[n]o person shall … be compelled in any criminal case to be a witness against himself …." U.S. Const. amend. V. As a corollary to the right against self-incrimination, "[a] prosecutor may not make comments, either directly or indirectly, that lead the jury to draw a negative inference from a defendant's decision not to testify." *United States v. Tucker*, 714 F.3d 1006, 1014 (7th Cir. 2013); *see Griffin v. California*, 380 U.S. 609, 614–15 (1965). At issue here is a prosecutor's indirect comment, which "will be deemed improper only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on

the defendant's silence." *United States v. Gustafson*, 130 F.4th 608, 618 (7th Cir. 2025) (cleaned up).[2]

Eiland's Fifth Amendment challenge focuses principally on the following remark from the prosecutor's rebuttal argument: "And I get why Mr. Boyle focused on what there wasn't, is because they don't have an answer for what there was." This comment, Eiland argues, constitutes an improper indirect comment on his silence. He points to a line of cases holding that "[a] prosecutor's comment that the government's evidence on an issue is 'uncontradicted,' 'undenied,' 'unrebutted,' 'undisputed,' etc., will be a violation of the defendant's Fifth Amendment rights if the only person who could have

---

[2] If an indirect comment is deemed improper under this test, our caselaw is inconsistent about what comes next. On one hand, we have stated that when a prosecutor's improper comment "violated one of the defendant's specific trial rights, such as the Fifth Amendment right against self-incrimination," we proceed (assuming preservation) to *Chapman v. California*'s constitutional harmless error standard, whereas "more general prosecutorial misconduct, such as vouching for the credibility of a witness or misstating evidence," is analyzed under a multifactor test to "determine 'whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Chapman v. California*, 386 U.S. 18, 24 (1967). On the other hand, we have—more recently, but without citation to cases like *Mietus* that set out a bifurcated approach—said that all manner of prosecutorial misconduct, including allegedly improper comments on the defendant's silence, go through the multifactor fair-trial test. *See Gustafson*, 130 F.4th at 617–18; *United States v. McLain*, 146 F.4th 602, 613–14 (7th Cir. 2025). We need not address this tension here because, under our caselaw, the prosecutor's remark was not improper, and even if it was improper, plain error review would preclude reversal. Nonetheless, we identify the potential strain for a future panel's attention.

contradicted, denied, rebutted or disputed the government's evidence was the defendant himself." *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996); *see United States v. Buege*, 578 F.2d 187, 189–90 (7th Cir. 1978); *United States v. Handman*, 447 F.2d 853, 855 (7th Cir. 1971).

Those cases, however, do not create a per se rule that obviates the need to consider the prosecutor's comments "in the larger context of the parties' closing arguments and the trial itself." *United States v. Tanner*, 628 F.3d 890, 896 (7th Cir. 2010); *see, e.g.*, *United States v. Chavez*, 12 F.4th 716, 733 (7th Cir. 2021). In *Gustafson*, for example, the prosecutor remarked during rebuttal argument that "[t]here's nothing to contradict" a government witness's testimony about a key fact, and that "[n]o one came in here and said anything different than that." 130 F.4th at 617. We found no impropriety, however, because "[t]he most reasonable interpretation of the prosecutor's remark is that it was a rebuttal to defense counsel's reference to facts not in evidence" during its closing. *Id.* at 618. The prosecutor's comment was therefore "clearly aimed at defense counsel's" argument, not the defendant's silence. *Id.*

Applying that context-specific inquiry, the prosecutor's remark was not improper—it did not manifestly intend to refer to Eiland's silence, nor would the jury naturally and necessarily understand it as such. Instead, as in *Gustafson*, the prosecutor here was merely responding to the defense counsel's closing argument, which focused on purportedly missing evidence. Three pieces of the context surrounding the challenged words make this clear. First, immediately before the "no answer" remark, the prosecutor referenced defense counsel's missing-evidence argument and asked the jury to "focus on the evidence that's before you," which "shows that

[Eiland] is guilty." Second, the very sentence on which Eiland focuses began by identifying the defense attorney's "focus[] on what there wasn't" during closing argument. Third, immediately after the "no answer" sentence, the prosecutor listed off the evidence the government had introduced at trial—i.e., "what there was"—and argued that it established guilt beyond a reasonable doubt. The prosecutor focused the jury's attention on the evidence before it, not on Eiland's decision not to testify. Choosing Eiland's interpretation would contravene our admonition to "not lightly assume that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *United States v. Alviar*, 573 F.3d 526, 543 (7th Cir. 2009) (cleaned up).[3]

Eiland also takes issue with the prosecutor's comment that "both sides start at zero," which he argues equated the defense's and the government's burdens. Context, again, undermines Eiland's contention. The prosecutor argued (emphasis added):

At the very beginning of this process during jury selection you were all told and you were all questioned, and it was true that everyone starts at zero. *Both sides start at zero. And it is the government's burden to present evidence to show that the defendant was guilty beyond a reasonable doubt.* I like to think of it as a blank canvas. You

---

[3] Eiland suggests that Juror A's comment proves that at least one juror did, in fact, understand the prosecutor's remark as a comment on Eiland's silence. But as we explain below, Juror A's comment neither stated nor suggested any connection to the prosecutor's argument.

came into this case knowing nothing, and the evi-
dence—and the government started putting up evi-
dence, filling in that canvas to provide you a painting
of what happened.

Given that the prosecutor explicitly stated in the very sen-
tence after the challenged remark that the government shoul-
ders the burden of proving guilt beyond a reasonable doubt,
Eiland's argument that the prosecutor equated the two sides'
burdens is untenable.

Even if the prosecutor's remarks were improper, Eiland
has not carried his burden of establishing plain error. For the
same reasons we find the comments proper, Eiland failed to
show that "the government's comments were obviously or
clearly improper." *United States v. Jones*, 600 F.3d 847, 856 (7th
Cir. 2010). Moreover, given the evidence against him and the
judge's instructions regarding the burden of proof and the de-
fendant's right not to testify, Eiland has not established that
any error affected his substantial rights.

## C. Juror Bias

Finally, Eiland requests a new trial, or at least an eviden-
tiary hearing, on the basis that Juror A improperly considered
his decision not to testify and thereby deprived him of his
rights to an impartial jury and due process. The parties dis-
pute the extent to which Eiland preserved this challenge, but
we need not resolve their disagreement. We reject Eiland's
contention by applying the standards of review that would
apply to the issues presented if they were preserved. For the
interpretation of the Federal Rules of Evidence, that standard
is de novo. *See Daniel v. Cook County*, 833 F.3d 728, 739 (7th
Cir. 2016). For the remaining issues, that standard is abuse of

discretion. *See Arreola v. Choudry*, 533 F.3d 601, 605 (7th Cir. 2008) (whether to order new trial); *United States v. King*, 627 F.3d 641, 650 (7th Cir. 2010) (whether to order evidentiary hearing); *United States v. Torres-Chavez*, 744 F.3d 988, 997 (7th Cir. 2014) (evidentiary rulings and "consideration of [a] juror bias issue on the merits").

The question Eiland presents is, at its core, an evidentiary one. Because Eiland's request for a new trial is entirely based on Juror A's post-trial remark, he can prevail only if that comment is admissible. *See Torres-Chavez*, 744 F.3d at 998.

Federal Rule of Evidence 606(b) governs a juror's ability to testify during an inquiry into the validity of a verdict. Rule 606(b)(1) provides the general rule: "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). As relevant here, Rule 606(b)(2) then provides two exceptions. The first permits a juror to "testify about whether … extraneous prejudicial information was improperly brought to the jury's attention." *Id.* 606(b)(2)(A). The second allows a juror to "testify about whether … an outside influence was improperly brought to bear on any juror." *Id.* 606(b)(2)(B). The rule thus strikes a balance between the "competing considerations" of, on one hand, "freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment," and on the other hand, avoiding "irregularity and injustice." *Id.* 606(b) advisory committee's note to proposed rule.

We held in *Torres-Chavez* that a juror's post-verdict revelation that he improperly considered a defendant's silence is

inadmissible under Rule 606(b)(1). 744 F.3d at 998. Eiland thus concedes for his challenge to be viable, he must identify "extraneous prejudicial information" or "an outside influence" so that Rule 606(b)(2) applies. He claims the prosecutor's "no answer" remark during rebuttal argument fits the bill. That is, Eiland proposes that the prosecutor's alleged invitation to consider his silence constitutes "extraneous prejudicial information" or "an outside influence" under Rule 606(b)(2) because it is not evidence and not part of the jury's deliberations.

The district court acted within its discretion in denying Eiland's motion for a new trial without questioning Juror A. That is because "[a] judge's duty to investigate 'arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.'" *King*, 627 F.3d at 650 (quoting *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994)). "In other words, '[a] defendant's mere allegations of taint or his unsubstantiated suspicions do not necessitate inquiry by the court.'" *Id.* (alteration in original) (quoting *Davis*, 15 F.3d at 1412). Thus, in *King*, we found no abuse of discretion where a district court denied the defendant's motion for a new trial without questioning the jurors about a note expressing fear for their personal safety, as "[n]othing in the note suggested exposure to outside influences." *Id.*

Here, nothing in Juror A's remark stated or implied any connection to the prosecutor's closing argument. Instead, Juror A's comment falls within the heartland of Rule 606(b)(1) and *Torres-Chavez*; it concerned "the effect of anything on that juror's … vote" and Juror A's "mental processes concerning the verdict." Thus, the district court did not abuse its

discretion in denying Eiland's motion for a new trial without questioning Juror A. Because Eiland has not shown any connection between Juror A's comment and the prosecutor's closing argument, we need not address whether statements during a closing argument can be "extraneous prejudicial information" or "an outside influence" under Rule 606(b)(2).

*  *  *

The judgment of the district court is

AFFIRMED.